## THE " MARGARET."

1. A steam-tug which engages to tow a vessel into a port, although not a common carrier nor an insurer, is bound to exercise reasonable skill and care in every thing relating to the work until it is accomplished, and she is liable for the want of either to the extent of the damage sustained.

2. She is bound to know the channel of her home port, how to reach it, and whether, in the state of the wind and water, it is safe and proper to attempt to enter with a tow.

APPEAL from the Circuit Court of the United States for the Eastern District of Michigan.

The facts are stated in the opinion of the court.

Mr. William P. Lynde for the appellant.

Mr. Alfred L. Cary, contra.

MR. JUSTICE SWAYNE delivered the opinion of the court.

This is a cause in admiralty. The libel alleges that the tug Margaret," in towing the brig " Mechanic " into the port of Racine, Wis., conducted the process so carelessly and unskilfully that the brig and cargo were sunk. This proceeding was instituted to recover damages for the loss sustained by the libellants. A decree was rendered in their favor, from which an appeal was taken to this court.

The entrance into the harbor is at the mouth of Root River. It has been improved by two piers. One of them is on the north, and the other on the south side. They are parallel to each other, and extend into the lake in a direction nearly due east, the north one running out about three hundred and thirty feet farther than the south one. The distance from the inside of the outer end of the south pier directly across to the inside of the north pier is two hundred and thirty-eight feet. At the entrance of the harbor, and for some distance farther west than the east end of the south pier, the channel ran close along the south side of the north pier. It was about seventy-five feet wide. South of the channel, between it and the south pier, and opposite to the end of that pier, there was a bar, with shoal water upon it. Just inside of the north pier the depth of water in the channel was fifteen and a half feet. From there to a point a long distance within the piers it varied; but the depth

was nowhere less than thirteen and a half feet. The depth upon the bar before mentioned was nine and a half feet. The brig at the time of the disaster drew ten feet.

The wind at the port was north-easterly, and was a light breeze. At the mouth of the harbor ground-swells came in from the lake. They were met by the undertow in the river. This increased the commotion of the waters. The highest swells broke over the end of the south pier, which was five feet above the ordinary water-level. This height of the swells was due to the shallowness of the water there. The harbor-master says, in his testimony : " As near as I could judge, the swells came up on the south pier. On the north pier they were not near so high. The south pier is where the shoal water is." Speaking of the channel hard by the north pier, he says : " I should think there was about half the swell there that there was on the south side of the harbor." Another witness says : " I should say there was not over twenty inches rise and fall on the mean level."

Such was the state of things to be encountered by the two vessels in entering the harbor, when the casualty set forth in the libel occurred.

On the 27th of November, 1869, the brig left the port of Suamico with a cargo of lumber for the port of Racine. She arrived off the latter port about noon on the 30th of that month, and at once signalled for the tug to come out and tow her in. The tug obeyed the signal. When she reached the brig, the latter was lying about a mile and a half north-east from the mouth of the harbor. The tug approached the brig on her starboard side. The captain of the brig inquired of the captain of the tug whether there was " much swell on." The latter answered, " No." The captain of the brig said his vessel drew ten feet of water. At the same time the linesman on the tug called for a line, and it was handed to him over the starboard bow. With reference to the wind where the vessels then were, the captain of the brig says : " There was a kind of a dead swell ; there was no sea ; there was very little wind." On these points there is no controversy between the parties.

The line was attached to the starboard side of the brig. Subsequently, another line was fastened to the port side, and both

lines were so shortened as to bring the tug and the tow into close proximity. There is an irreconcilable conflict in the testimony as to the time when the second line was applied, and when the lines were shortened. The witnesses for the respondents insist that both occurred before the towing began. Those for the libellants maintain that the second line was applied later, and that the tug stopped, and the lines were shortened when the tug was between two and three hundred feet from the north pier. It is not easy to reconcile these discrepancies; and we do not deem it very material to do so, by reason of facts occurring subsequently, and which are in nearer relation to the disaster.

The tug laid her course in a south-westerly direction towards the end of the north pier. Upon reaching it she made a short turn to the starboard around it and entered the harbor. The brig followed. She had entirely lost her steerage-way, and ceased to obey her helm. The tug had lost all control over her. She sagged off towards the south pier, and grounded on a bar, which she struck repeatedly with the rise and fall of the water. The tug stopped and then resumed her traction. The port line broke. Presently the starboard line broke also. The brig was thrown by the force of the swell upon the end of the pier. A hole was stove in her quarter. She was otherwise seriously damaged, and sunk. It is not denied that, in the crisis, the tug did all that could be done to relieve her from the perils of her situation. The effort was unavailing.

No serious attempt was made here to inculpate the brig. The tug was the dominant mind and will in the adventure. It was the duty of the brig to follow her guidance, to keep as far as possible in her wake, and to conform to her directions. The exercise of reasonable skill and care within this sphere was incumbent on the tow. It does not appear that there was a failure in any of these particulars.

If the port line was too weak, the tug should have called attention to it. Silence was a fault. The learned circuit judge found as a fact that the breaking of the line was not the cause, but the consequence, of the grounding; and in this we concur with him.

The tug was not a common carrier, and the law of that rela-

tion has no application here.  She was not an insurer.  The highest possible degree of skill and care were not required of her.  She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in every thing relating to the work until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the extent of the full measure of the consequences. *Brown* v. *Clegg*, 63 Penn. St. 41; *The Quickstep*, 9 Wall. 665; *Wooden* v. *Austin*, 51 Barb. 9; *Wells* v. *Steam Navigation*, 8 N. Y. 375; *Steamer New Philadelphia*, 1 Black, 62; *The Cayuga*, 16 Wall. 177; *James Gray* v. *John Frazier*, 21 How. 184.

The port of Racine was the home port of the tug.  She was bound to know the channel, how to reach it, and whether, in the state of the wind and water, it was safe and proper to make the attempt to come in with her tow.  If it were not, she should have advised waiting for a more favorable condition of things. She gave no note of warning.  If what occurred was inevitable, she should have forecasted it, and refused to proceed.  The spring-head of the disaster was the sudden turn of the tug around the end of the pier, combined with the shortness of the tow-lines.  These involved the stopping of the tug and the loss of the steerage-way of the brig.  The drifting of the latter, her impinging upon the pier, and her fracture and sinking, necessarily followed.

Conceding that the mode of entering the harbor by the tug was the best under the circumstances, and the disaster thereafter inevitable, then the effort showed a clear want of judgment.  As before remarked, she should have known this, and governed herself accordingly.  Her conduct, in this view, was more than an error.  It was a fault; and upon this ground she should be condemned.

But there is another view of the case, more satisfactory to our minds and more clearly conclusive against the tug.

She took charge of the brig a mile and a half from the harbor.  She had the whole surface of the lake for sea-room.  There was nothing in the way.  The wind was light and the sea was calm.  She could have made any curvature necessary to put herself and the tow upon a right line to the harbor.  Her course could then have been laid accordingly.

She could have entered just where she did enter. She could have safely passed the swells she would have encountered. Her experience as she did enter proves this to have been so. She would have avoided the shoal-water and bar south of the channel where the swells were the highest. A single line would have answered for the tow. It might have been of any length deemed proper. The tow would have had ample steerage-way, and have obeyed her helm. She could have been kept in the wake of the tug, and would have safely passed the ground-swell, as did the tug. There being ample depth of water in the channel, and being larger and heavier than the tug, she would have encountered even less of difficulty and danger. The tug need not have stopped a moment. There would have been no tension and breaking of the lines by the grounding and jerkings of the brig. The traction would have gone on in unbroken continuity until the tow was so far within the harbor as to have been out of peril. The expert testimony proves that this could and should have been done. We find no sufficient answer to this view either in the record or in the able and elaborate argument submitted by the counsel for the appellants.

Upon this ground, also, we find the tug in fault.

*Decree affirmed.*