## Case No. 5,939.

### HALL et al. v. LITTLE et al.

[2 Flip. 153; 18 Alb. Law J. 151; 6 Reporter, 577; 2 Tex. Law J. 54; 24 Int. Rev. Rec. 314, 374; 3 Cin. Law Bul. 598, 942.] [1]

Circuit Court, D. Kentucky. April 13, 1878.

COLLISION—THE VESSEL IN FAULT — NEGLIGENCE —BURTHEN OF PROOFS—TRUE RULE AS TO NEGLIGENCE—COLLISION IN DAY LIGHT — PRESUMPTION — PILOT—ACCIDENT UNAVOIDABLE —WHAT NEGLIGENCE PLAINTIFFS MUST SHOW.

1. The result of the authorities, English and American, is that when a collision occurs between a vessel in motion propelled by steam or sail, and a vessel or other thing at rest, the vessel in motion is prima facie in fault; that it can excuse itself only by showing the cause of the disaster, and that it must appear on such showing that the cause was not one of the ordinary forces of nature, but something unexpected, as a sudden storm, an unknown current or unexpected derangement of machinery, which could not have been anticipated or guarded against by the exercise of ordinary nautical skill.

2. Neither in a civil nor criminal case does the burthen of proof ever shift. It remains on the party on whom it rested in the beginning.

3. When the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care.

4. When the collision occurs in broad day light the legal presumption is that the accident was occasioned by the fault of the vessel in motion.

5. The proof as to how the pilot turned his wheel, and that his management was proper under the circumstances, by himself and others

1 [Reported by William Searcy Flippin. Esq., and here reprinted by permission. 6 Reporter, 577, contains a condensed report.]

—and that proper nautical skill was used, is a very different thing from showing that he was skillful, and in the emergency did, in his opinion, exercise his best skill and judgment. The fact that the pilot did what his best judgment dictated may prove his want of judgment, but not that the act was unavoidable.

6. To entitle plaintiffs to recover it is not incumbent on them to show the specific act of negligence committed by defendants. It is superfluous to inquire wherein the steamboat was not managed with proper nautical skill when the collision was caused by a vessel having the power to move or stop at pleasure in a channel of sufficient breadth, without any superior force compelling her to the place of collision. It is not necessary for the plaintiff to trace specifically in what the negligence consists, and if the accident arose from some inevitable fatality, it is for the defendant to show it.

[This was a suit in admiralty by Hall & Eddy against William Little and others to recover for the breaking and loss of a raft of logs in the Ohio river, attached to the Kentucky shore, opposite Louisville, with which the steamboat Brilliant, owned by the defendants, collided.]

John Mason Brown, Isaac Caldwell, and G. C. Wharton, for plaintiffs.

Bijur & Davie, for defendants.

BALLARD, District Judge. This cause was tried by the court without a jury, in virtue of a written agreement of the parties. On the 1st of August, 1875, the steamboat Brilliant, owned by the defendants, landed a heavy tow on the south side of the "Towhead" or island in front of Louisville, and about three hundred or three hundred and fifty feet below its head or upper end. The tow consisted of two rafts which were lashed together, and two barges. One of the rafts—that is, the one which lay out in the stream—was composed of five strings of logs, and the other of six strings, and in front of the rafts constituting a part of the tow were two barges loaded with coal and bricks. The tow was more than three hundred feet long, and was very heavy. It was, however, landed without difficulty and with safety, though the river was rising rapidly and there was a strong current running diagonally from the point or head of the "Towhead" to the Kentucky shore. The channel between the "Towhead" and the Kentucky shore is not much used by steamboats, but is extensively used as a safe deposit for flat-boats and rafts, which lie along and are attached to either shore. At the time the Brilliant landed her tow, as above mentioned, the plaintiffs had a large raft lying attached to the Kentucky shore, very nearly opposite to—perhaps a little below— the tow, and there were lying along the same shore below the raft of the plaintiffs many other rafts. There were also lying along the shore of the "Towhead" below the tow many rafts, the first of which was distant from the tow three hundred and six feet.

After the Brilliant had landed her tow in safety, and had notified the owners thereof,

said owners, apprehending danger to their logs from the rising river, employed the Brilliant to remove a portion of the tow, that is, the outer raft or five strings of logs, to their mill, situated on the Kentucky shore about a mile below. The precise time when the Brilliant undertook to perform this task does not very satisfactorily appear; but, giving due weight to the conjectures of witnesses, and to all that transpired, I think it fair to assume that about one hour elapsed between the first landing of the Brilliant with its tow and this attempt.

In the performance of its undertaking the steamboat seems to have been utterly powerless. It seems to have been entirely at the mercy of the current. The pilot was unable to steer it. Though the raft lying below was plainly visible he could not or did not so steer his boat as to avoid it. He allowed his boat and tow to drift or be forced by the current against this raft. The consequence was that the boat, which was attached to the upper end of its tow, was driven across the channel and it and its tow coming in contact with the plaintiff's raft broke therefrom a large number of logs, many of which were never recovered. The value of the logs wholly lost amounts to $1,800.

The pilot of the Brilliant was possessed of competent skill, and the boat was, at the time of the accident, in all respects properly manned. The pilot testifies that he used his best skill to avoid the obstruction below, and to get his boat and tow into the current, but he failed. He had but a short time before so steered his boat in the same current as to manage and safely land a large and heavy tow, and he did not doubt his ability, with the same boat, to manage less than half the original tow in bulk and much less than the half in weight. There is no direct evidence as to the quantity of steam the boat was carrying. The engineer was not called to testify. He has not been for some time connected with the boat. He has gone South, and it seems his testimony could not have been procured without much difficulty, if at all. The pilot, however, testifies that the engineer was subject to his orders—that his duty was not to reduce the steam without his order, to by given by the ringing of a bell; that he gave no such order, and that when the boat moved off, it "felt and moved" as if it were supplied with sufficient steam. How the pilot steered his boat; what precise manoeuver he made does not satisfactorily appear. All that appears is that he steered his boat in that way which he thought was best calculated to bring his tow into the stream and avoid the obstruction below.

The plaintiffs claim that they have sustained loss through the negligence of the defendants. Their action is grounded on negligence, and in my opinion, the burden is on them to establish the negligence. But having shown the circumstances under which the injury was sustained; having shown that

their logs were lying at the shore; that the defendants' boat, in daylight, unaffected by any wind, ran into or came in contact with them, and inflicted the injury complained of, I think the plaintiffs have established a prima facie case of negligence, which is not affected by any testimony or explanation offered by the defendants. I do not say the plaintiffs, having shown certain facts, that the burden of proof which was on them in the beginning has shifted to the defendants. I have heretofore repeatedly said that, in my opinion, the burden of proof never shifts in either a civil or a criminal case, and that it remains on the party on whom it rests in the beginning. What I do say, however, is that the plaintiffs, having shown the circumstances under which the injury complained of was inflicted, I should conclude they have established a prima facie case of negligence which entitled them to judgment unless I shall conclude that the facts, proven by the defendants, established that the accident arose from a cause other than the want of care.

The true rule is, I think, to be found in the case of Scott v. London & St. K. Docks Co., 3 Hurl. & C. 596. It is there said that "when the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

To the same effect are many other cases. In Bowas v. Pioneer Tow-Line Co. [Case No. 1,713], the court says, "The collision occurred in broad daylight. * * * The legal presumption * * * is that the accident was occasioned by the fault of the vessel in motion," etc. In the case of The Scioto [Id. 12,- 508], Judge Ware says: "It may be assumed as a general rule that when a collision takes place between a vessel under sail and a vessel not under sail, the prima facie presumption is, that the fault is imputable to the vessel in motion." See Strout v. Foster, 1 How. [42 U. S.] 89.

It is unnecessary to further illustrate this doctrine. Defendants' counsel admits its correctness; but they claim that they have met the plaintiffs' prima facie case. They claim they have shown that their boat was properly equipped and manned; that it was supplied with sufficient power or steam; that it was properly navigated; that there was a strong current running from the place where it lay to the place where plaintiffs' raft was lying, and that there was an eddy formed at the bow of their tow, the tendency of whose current was to force the head of the tow towards the island and the obstruction below.

I cannot admit that the plaintiffs have shown to my satisfaction all which they claim to have shown. It is not shown to my satisfaction that the boat was properly navi-

gated, and it is very far from being shown that it was supplied with sufficient steam. It is one thing to prove by the pilot what he did, how he turned or managed his wheel, and by him and others that such management was proper under the circumstances, such as was demanded by the exercise of proper nautical skill, and quite a different thing to show that the pilot is skillful, and that in the emergency he did, in his opinion, exercise his best skill and judgment. To adopt the language of Judge Grier in the case of The Louisiana, 3 Wall. [70 U. S.] 174: "The fact that the pilot did what his best judgment dictated may prove his want of judgment, but not that the accident was unavoidable." It may prove that however skillful he was ordinarily he was on this occasion wanting in skill.

In respect to the boat being supplied with sufficient steam, it has been seen the defendants offered no direct testimony. The engineer to whom only the fact was known was not called. The pilot is the only witness produced by defendants who speaks to the fact. He, however, does not speak to the fact itself. He could not speak to it because it was not within his knowledge. He speaks only of other facts, on whose existence he bases his argument and conclusion that there was sufficient steam. On the other hand, Hall and other witnesses produced by the plaintiffs, testify to facts on which they base their argument and conclusion that there was not sufficient steam. They testify that the steamer did not have sufficient steam. They do not mean to be understood as saying that they examined the steam gauge. They mean only that from what they saw, the landing in safety by the steamer, a short time before, of a tow much heavier than that which it undertook to move; the utter inability and failure of the boat to control the lighter tow; the drifting of the boat and tow with the current, they concluded that the steamer was powerless. In my opinion, the facts proven by these witnesses, which facts are confirmed by all the witnesses who have been before me, are quite as significant as those testified to by defendants' pilot, and, in my judgment, the conclusion deduced from them by the witnesses is much more fully justified that the conclusion of the pilot. Upon precisely similar testimony the supreme court in the case of Culbertson v. Shaw, 18 How. [59 U. S.] 586, assume the steamer Southern Belle was not supplied with sufficient steam.

It follows as a necessary deduction from the rules of law hereinbefore stated, that to entitle the plaintiffs to recover it is not incumbent on them to show the specific act of negligence committed by the defendants. It is, however, not necessary that such a conclusion should be left to be inferred; it is distinctly and directly declared by the supreme court, in the case of The Granite State, 3 Wall. [70 U. S.] 314, and by the court of exchequer in England, in the case of Skin-

ner v. London, B. & S. C. Ry. Co., 5 Exch. 786. In the first case the court say, "Under such circumstances we are not called upon to inquire wherein the steamboat was not managed with proper nautical skill. * * * Such inquiry is superfluous when the collision was caused by a vessel having the power to move or stop at pleasure in a channel of sufficient breadth, without any superior force compelling her to the place of collision." In the latter case the court say, "it is not necessary for the plaintiffs to trace specifically in what the negligence consists, and if the accident arose from some inevitable fatality, it is for the defendants to show it." But were it incumbent on the plaintiffs to trace the specific act of negligence which caused the collision, I should be inclined to say they have sufficiently done so. I should be inclined to say they have established, by the weight of evidence, that the collision arose from the fact that the steamer was not at the time supplied with sufficient power or steam.* In no other way than on this assumption can I understand why the steamer did not yield to the skill of the pilot, if, indeed, he used his usual skill. In no other way can I account for the boat drifting as helplessly as the raft itself would have drifted without her.

But the defendants contend that their boat did not drift. They insist that it was driven by the cross current, which was due to the great height of water, against the plaintiffs' raft, in spite of the fact that it had sufficient steam and was skillfully navigated. They insist that, as it was not shown affirmatively that their boat was either unskillfully navigated or insufficiently supplied with steam, and it was shown that it was obliged to encounter a strong cross current, the court must ascribe the catastrophe wholly to the irresistible action of the current, and cannot impute to the boat any want of care.

The fallacy of this contention lies in the fact that the current, though violent, was not unusual. It was the usual current incident to the state of water. It was the same current on which the defendants had first landed their heavy tow, and which they had thus demonstrated might be guarded against by the exercise of proper skill. Boats which navigate the Ohio river, in either high or low water, must be held to a knowledge of the currents incident to the state of water, and they must be held responsible if they allow themselves to be driven by such currents to the infliction of injury to the property of others.

The books are full of cases which establish the correctness of this position. The Margaret, 94 U. S. 494; The Louisiana, 3 Wall. [70 U. S.] 173; The Granite State, Id. 310; Ure v. Coffman, 19 How. [60 U. S.] 56; Rogers v. Steamer St. Charles, Id., 108; New York & V. S. S. Co. v. Calderwood, Id. 241; The Clarita, 23 Wall. [90 U. S.] 13; The Sea Gull, Id. 165; The Great Republic, Id. 20; Culbert-

son v. Shaw, 18 How. [59 U. S.] 584; Niles Works v. Page, 24 How. [65 U. S.] 228; [Union Steamship Co. v. N. Y. & Va. Steamship Co.] Id. 313.

Notwithstanding this array of authorities to which many more, both English and American might be added, the counsel of defendants rely with apparent confidence on the case of The Farragut, 10 Wall. [77 U. S.] 334. The facts of this case are not stated either by the reporter or the court. The respective allegations of the libel and answer only are given. By the libel it was sought to recover of the Farragut for the benefit of the Buckeye Mutual Insurance Company the loss which its assured had incurred by the alleged careless navigation of the Farragut in towing the canal boat Ajax through the railroad bridge which spans the Illinois river at Meredosia The answer denied the negligence and set out what occasioned the loss.

Both the circuit and district courts found that the defense was sustained by the evidence. The proctor of the libellants in his argument imputed to the boat only one act of negligence, to wit; its failure to have a proper lookout. The court throughout nearly the whole of its opinion confines itself to the consideration of the libellants' proposition, and, in the last paragraph, which consists of four lines only, it says "it is also evident that the loss was occasioned by the violence of the cross current, which was due to the great height of water prevailing at the time, and was therefore the result of one of the ordinary dangers of navigation."

It is quite evident the court considered that as the insurance company had insured the Ajax against the "dangers of the river," and the Farragut had, by its contract, exempted itself from responsibility for loss arising from the usual dangers and hazards of river navigation. the loss should be borne by the insurance company which undertook to pay such loss, and not by the Farragut, which had attempted by contract to exempt itself from loss occasioned by one of the ordinary dangers of the river.

The court does not discuss, and I do not think it even considered, how far it is the duty of steamers navigating our rivers to guard against the ordinary effect of known currents. I take it to be the result of all the authorities, English and American, that, when a collision occurs between a vessel in motion propelled by sail or steam, and a vessel or other thing at rest, the vessel in motion is prima facie in fault; that it can excuse itself only by showing the cause of the disaster; and that it must appear on such showing that the cause was not one of the ordinary forces of nature, but something unexpected: such as a sudden storm, an unknown current, or an unexpected derangement of machinery, which could not have been anticipated or guarded against by the exercise of ordinary nautical skill.

Here, as we have seen, the plaintiff's raft

was at rest; the defendants boat was in motion propelled by steam. There was no storm, no sudden wind, no derangement of machinery, no unknown current, in short, nothing to excuse the disaster. The irresistible conclusion is that the steamboat should be condemned as in fault, even if the evidence touching the specific act of neglect—its failure to have sufficient steam—were less satisfactory. The plaintiffs may have judgment for $1,800 damages and their costs, and the attachment granted by the state court before the cause was removed into this court must be sustained.