Withey, D. J.
In seeking to enter tbe harbor of Ludington, the schooner Mary was taken in tow by the tug Margaret, June 20, 1878, about 9 o’clock in the evening. She was about five miles south of the south pier, and three or four miles out from shore; wind from the north-west, from 15 to 20 miles an hour. The course taken to reach the harbor was about north by east; speed about three or four miles an hour, the schooner carrying her mainsail, foresail, and fore-staysail. The two piers at Ludington run due west from the shore; the south pier extends into the lake about 200 feet further than the north pier, so that the vessel in entering the harbor had to round the south pier. The same course was continued after the tug took hold of her until the turn was made to go into the harbor. In entering, the schooner went off to the northward, and north of the north pier, when the line was cut by the tug. During the night the schooner was damaged from the position she occupied, and this suit is brought to indemnify her for such damages. The sea was running so that the current tended to carry the vessel leeward. The captain of the schooner states that when within half a mile of the south pier he ordered the mainsail lowered, and it was slackened about one-half down, or a little more; that the tug kept its course, passing the end of the south pier at about 100 *256 feet distant, and until nearly opposite the end of the north pier, then turned sharp, the line slackened, and the schooner “shotpast the dock, when a strain came on the tow-line,” and she struck the end of the north pier, and the tug cut the line. He testifies that he received no orders from and gave none to the tug; but says when he gave his line to the tug he asked the master if-he should keep on sail to help her along, and received answer, “Yes, sir;” that just prior to entering she was steering about north, or north by east, and as she passed the end of the south pier “then she was turned.” He says he cannot state what way the vessel was headed when she struck the end of the north pier, “because she was going off to the eastward fast when she struck.” When asked the reason of the vessel going on the north pier and around it, he answers, “Prom the fact of the captain (of tug) not bringing the vessel far enough out into the lake to the westward and giving a chance to follow the tug into the harbor, and having cut the line.”
The master of the tug testifies that he had the vessel in tow from an hour and a half to two hours; that she had on her foresail, mainsail and jibs; that he thinks they were west of the south pier before rounding to, to come in, from 1,200 to 1,400 feet, because he could not see the south pier when he got in range of the piers or light; that the vessel kept on her canvas after they had rounded to to make the harbor; that she straightened up in line of the tug before the latter reached the end of the piers; that as she rounded to he could see both her tow-line and her signal lights; that she followed the tug until he got abreast of the end of the north pier, when she sheered off to the northward of the north pier. He was asked what caused the vessel to sheer and go to the northward of the north pier, and answered, “having her mainsail on.” •
He further testifies that the vessel had her “mainsail on, and her sheets hauled clear up, coming close by the wind, before we made the turn. When we got pretty close to the end of the north pier a sea happened to strike his port quarter and that carried his stem to the southward; enough so that *257 his mainsail would fill again, and so that the schooner luffed up and shot by the end of the north pier. The schooner had to slack her main peak halyards in order to make her course up alongside the north pier; when she got around to the northward she shot clear by the pier.” He further states that the tug was there just inside the north pier, so that her stern was just about even with it, and she was about 25 feet south of the north pier.
There are the usual contradictions and disagreements between the men on the schooner and those on the tug touching the material facts. There are five witnesses, sailors and masters of vessels, having no interest, who agree substantially that the cause of the disaster was attributable to unskilful management by the master of the schooner. Taking into consideration the direction and strength of the wind and the condition of the sea, it would not seem to be proper management on the part of the master of the schooner, after turning to go into the harbor in tow of a tug, to carry any mainsail at all. To ca¡rry any part of her mainsail would, in the opinion of experienced sailors, have a tendency to render her unmanageable; cause her to broach to and go to the windward in spite of the tug.
It is claimed that the tug was at fault in failing to keep the line, and not using proper efforts to bring the vessel back from the north side of the north pier, but masters and seamen of much experience have said that the tug could not have prevented the disaster after the schooner went to the northward of the pier. It was plainly the duty of the master of the vessel, in the absence of any directions from the master of the tug, to manage his helm and sails judiciously.
It is not contended that it was unsafe for the tug to undertake bringing the schooner in, from any condition of the wind or sea. It is claimed that the tug slackened her line at a critical moment for the vessel, and came too close to the end of the south pier when turning to come in. The better opinion seems to be, on the part of those competent to judge, that the vessel would be carried ahead so that the tow line would be *258 slackened between the seas in consequence of the force of wind and sea. Whether the line was slackened from any other cause does not satisfactorily appear. As to the distance west from the end of the south pier when they turned to come in witnesses do not agree, and this fact does not seem to us at all controlling.
The evidence establishes, in our opinion, that there would have been no difficulty in bringing the tow in safely had the schooner carried no part of her mainsail, and the question of liability appears to us to turn upon whether the tug or the schooner is responsible for so much after sail being carried from the time when the turn was made to come in.
The tow was from 120 to 180 feet in the rear of the tug. It was in the night, and in our opinion, unless the tug had assumed to take entire control and direction of the vessel, it was the latter’s fault if she had up part of her mainsail. To apply such rule is to do no more than to require of the captain of the schooner the exercise of that measure of care and skill which is incumbent on the tow. The Margaret, 94 U. S. 496; The Margaret, 5 Bissell, 357. In the latter case it is said there are certain duties incumbent on those who have the management of the tow. It is the duty of the tow to be steered properly; to follow in the wake of the tug, and to perform all those duties which nautical skill demands in order to properly manage the tow.
It is manifest that if the tow, at a critical point, when about to enter the harbor, carries such sail as to take her out of the control of the towing craft, either as to her headway or course, the tug should not be held at fault for any disaster that ensues.
We entertain the opinion that the libel should be dismissed, and decree accordingly, with costs to claimant.