## THE CHARLES ALLEN.

*(District Court, S. D. New York. March 10, 1885.)*

**1. TOWAGE—EVIDENCE—TOWAGE RECEIPT—CASTING OFF IN GALE.**

The steam-tug C. A. took in tow the bark E., bound to sea from the lee of Staten island, to tow her down the bay of New York. The wind was high at the time, and the pilot of the tug, before starting, told the pilot of the bark that if the wind increased the tug would be obliged to cast off before reaching buoy No. 8, at the upper end of the Swash channel, and that the bark's pilot should be on the lookout for that contingency, to which the latter assented. The wind did increase until the tug was in imminent danger of swamping; whereupon she gave several short whistles, to indicate that she was about to leave the bark, and then cast off the hawser. The bark attempted to make sail and get to sea, but grounded on the Romer shoal. This suit was brought against the tug for not having taken the bark "to sea," as it was alleged she agreed to do, and for negligence in abandoning her in an improper and dangerous place. A towage receipt, reciting that the bark was to be taken "to sea for $20," signed by one G., who procured the towage for the bark, and delivered to the master of the bark, was put in evidence. The $20 was not paid. *Held*, that no authority was shown on the part of G. to bind the bark, and, moreover, that the receipt was superseded by the subsequent conversation between the pilots.

**2. SAME—NEGLIGENCE—PERIL OF THE SEA—ERROR OF JUDGMENT.**

Two courses were open to the bark in the place where she was cast off: to anchor, or to attempt to get to sea. She chose the latter, and events proved that it was an error of judgment on the part of her pilot. *Held*, that the tug was liable only on proof of negligence; that is, the want of such reasonable care and skill as the circumstances demanded. No negligence could be attributed to her for starting at the time she did. She continued to tow the bark up to the very last moment that her own safety would permit, and she cast off under an undoubted compulsion from perils of the seas, and in a position where the bark had a fair option to continue under sail or to anchor; and the libel was therefore dismissed.

In Admiralty.

*Butler, Stillman & Hubbard* and *W. Mynderse*, for libelant.

*Benedict, Taft & Benedict*, for claimants.

BROWN, J. At about 9 o'clock or a little after, on January 17, 1885, the Swedish bark Elida, lying off Staten island ready for sea, was taken in tow by the steam-tug Charles Allen, to be towed down the bay. The bark had on board a Sandy Hook pilot, between whom and the pilot of the Charles Allen there was a brief conversation in regard to the distance that the tug was expected to go. The pilot of the tug testified that he said to him that if the wind should increase much he would be obliged to cast off before reaching buoy No. 8, which is on the east side of the Swash channel, and that he was to be upon the lookout; and that the pilot of the bark assented. Two or three of the tug's hands confirm this account. The pilot of the bark testified that the pilot of the tug said that he would leave him at buoy No. 8. There was a gale blowing at the time from the south-west, but its severity was not felt in the lee of Staten island, where the vessel was then lying. At a quarter past 10, on reaching buoy No. 13, known as the Elbow buoy, below Staten island, the full force of the gale, which was then from the westward, began to be felt. The

tow kept on about half an hour longer, when she was compelled by the fury of the wind and the sea to cast off her hawser and return. She gave two or three signal whistles during about five minutes before casting off, which were heard by the captain of the bark, but were not heard by the pilot, according to his own testimony; and the cast-off hawser was not taken aboard. At that time only the fore-top-mast staysail and maintop-mast staysail and jib had been set, the crew having been delayed in making sail in consequence of the anchor's fouling with the chain when raised. The bark afterwards passed clear of buoy No. 8, leaving it a length or two only on her port side; but not having sufficient sail set to be wholly manageable, through the force of the westerly gale and the ebb-tide, which sets to the eastward, she grounded upon the Romer shoals, between buoy No. 8 and the stone beacon, somewhat nearer the latter. This libel was filed against the tug for not having taken the bark as far as buoy No. 8, which it is alleged she agreed to do; and also for negligence in abandoning her at an improper and dangerous place.

1. The receipt put in evidence reciting that the bark was to be taken "to sea," is not proved in a manner sufficient to bind the bark. No authority is shown in Gundersen, who signed it, to represent the bark or her owners. As a memorandum made by a person assuming to procure towage for the bark, it was, moreover, superseded by the conversation subsequent thereto between the pilot of the tug and the pilot of the bark. On this point the weight of evidence is clearly to the effect that the tug would cast off whenever compelled to do so by increasing wind; and that the pilot of the bark was to be on the lookout for this contingency.

2. The main controversy in the case has been as respects the place where the bark was in fact cast off; the witnesses from the latter contending that it was about midway between the middle and upper buoys of the Romer shoals (Nos. 8 and 14) and near to the easterly line of the channel. The respondents insist that she was cast off when a little below the tail of the west bank and near the westerly shore of the channel; that is, when near buoy No. 13.

I am satisfied that the place where the bark was cast off has been put by the libelant's witnesses much too near buoy No. 8 and the easterly side, and that it was not to the southward of the upper middle buoy, (No. 14,) north-east of the center of the channel. It was probably about half a mile to the northward of buoy No. 14. The testimony of several disinterested witnesses confirms this; and the bark's reaching buoy No. 8 and passing to the westward of it, under the little sail she made use of, shows that she undoubtedly reached it by coming from the north-west, or north north-west. Had she come down along the easterly side of the channel so as to round the Elbow to the westward of buoy No. 8, there is no reason why she should not have gone down the Swash channel in the same manner, instead of grounding as she did. Having been cast off, as I find,

somewhat to the northward of buoy No. 14, the bark had two courses open to her: either to anchor, or to make sail in the attempt to proceed to sea. In that position I find nothing in the evidence to indicate that she could not have anchored with safety. The pilot chose the other course, of attempting to proceed to sea. The topmast staysails, the jib, the spanker, and fore and main top-sails were all set, or most of them, it would seem, before reaching buoy No. 8, though there is a little difference in the testimony of the brig's witnesses on this point. The spanker, however, was taken in, and the main top-sail was blown away before reaching No. 8. The evidence shows that the gale at this time was very violent, marking at the Equitable building 40 miles an hour; between 11 and 12, 41 miles; between 12 and 1, 44 miles. I cannot satisfactorily make out from the pilot's testimony why, after setting the spanker, the foresail was not set, so as to obtain sufficient canvas to make the bark manageable, unless it was by reason of the violence of the gale, which he found greater than he had recognized when the tug cast off. According to his own testimony, buoy No. 8 was not reached for some 20 minutes after the tug had left; and that time, he says, was sufficient to set sail enough to make the bark manageable and follow down the Swash channel. If this view be correct, the proximate cause of the bark's grounding was an error of judgment; I do not say a blamable error, but an error of judgment, nevertheless, in undertaking to make sail and proceed to sea in a gale of unusual violence, and finding only too late that he was unable to do so in time to avoid the Romer shoals, instead of anchoring at once, as he might safely have done when cast off.

The tug can be held liable only upon proof of negligence; that is, a want of such reasonable skill and care as the circumstances demanded. In the case of *The Margaret*, 94 U. S. 494, 497, the court say:

"She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work, until it was accomplished." *The Niagara*, 20 FED. REP. 152; *The M. J. Cummings*, 18 FED. REP. 178.

On behalf of the libelants it is urged that when the tug arrived off lower quarantine, at the Elbow buoy, (No. 13,) at a quarter past 10, she was in a position to feel the full force of the gale; and that the anemometer shows that it was then blowing nearly as hard as it did afterwards; and that her pilot ought to have anticipated the greater roughness of the sea further down, and that his boat would be unable to live in it, and was therefore chargeable with want of due care and skill in continuing on beyond buoy No. 13. But since I have no doubt that the bark was in fact cast off above buoy No. 14, she would have gained little or nothing from being cast off at some other point further to the northward, between buoys No. 14 and No. 13. She would have had no wider space to leeward and no better anchorage ground; and

with the intention which her pilot had of taking her out to sea, it was to her evident advantage that the tug should take her as far as possible; and it was the duty of the pilot of the tug to do so, so long as he did not thereby deprive the bark of the alternative of anchoring in safety, if that should be judged necessary.

The evidence satisfies me entirely that the tug did continue towing up to the very last moment that safety to herself and to the lives of those on board of her would permit. No negligence can be attributed to the tug in starting at the time she did. The weather bureau shows that from 7 to 9 the wind abated from 37 miles to 30; between 9 to 10, from 30 to 29; while after they had started, between 10 to 11, it increased again from 29 to 40 miles. In the lee of Staten island, at the time of starting, the wind appeared to be even much less than it actually was. The pilot of the tug not being chargeable with negligence in starting out, and as he cast off under the undoubted compulsion of imminent danger from perils of the seas, and at a place that afforded the bark a fair opportunity and a fair option either to anchor or to continue on under sail, as her pilot might deem expedient, I cannot find any negligence established against the tug, and the libel must therefore be dismissed.