## PEACE RIVER PHOSPHATE MINING CO. v. MULQUEEN et al.

(Circuit Court of Appeals, First Circuit. January 2, 1923.)

No. 1572.

1. **Evidence ☞20(1)—Common knowledge that ordinary wooden box barges of usual type and construction can be used only in comparatively quiet waters and under favorable conditions.**

It is common knowledge that ordinary wooden box barges of the usual type and construction, designed chiefly for transportation within harbors and inland waters, can only be used in comparatively quiet waters and under favorable conditions, because of their blunt bows and boxlike structure.

2. **Towage ☞11(1)—Duty of tug in performance of towage contract stated.**

Where owner of tug had contracted to tow ordinary wooden box barges of the usual type and construction, designed chiefly for transportation within harbors and inland waters, from New York to Boston in the winter time, the tug was not an insurer, but was bound to use reasonable skill and care, and take advantage of the most favorable conditions of wind and tide, and avoid the hazard of exposing the barges to heavy seas, and to be within reach of a sheltering harbor when a storm threatened.

3. **Towage ☞11(1)—Owner of barges, in offering them for towage, acquiesced in subjecting them only to hazards which could not be avoided by reasonable care and skill on part of tug.**

Owner of ordinary wooden box barges of the usual type and construction, designed chiefly for transportation within harbors and inland waters, in offering them for towage from New York to Boston in the winter season, acquiesced in subjecting them only to the hazards which could not be avoided by reasonable care and skill on the part of the tug.

4. **Towage ☞11(4)—Captain of tug, in sole command, was required to arrange barges in tow as he deemed best for their safety under all conditions.**

Captain of tug, in sole command of tug towing barges, had the duty of arranging the barges in the tow as he deemed best for their safety, and to determine the length of hawser between them under all conditions.

5. **Towage ☞15(2)—Loss of barges and cargoes held fault of tug.**

Evidence *held* to prove that loss of barges and their cargoes during towage from New York to Boston during winter season was the fault of the tug in exposing the barges to unnecessary strain and danger of bumping against each other through failure to lengthen the hawsers.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Petition by the Peace River Phosphate Mining Company, owner of the steam tug De Witt C. Ivins, against Daniel Mulqueen and others, for limitation of liability in case the tug should be found at fault for loss of defendants' barges and their cargoes. Decree for damage claimants, and petitioner appeals. Affirmed.

G. Philip Wardner, of Boston, Mass. (Joseph Cavanagh, of Boston, Mass., on the brief), for appellant.

Albert T. Gould (Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellees Sprague, Mehaffey, and Chappell Co.

Horace L. Cheyney, of New York City (Pierre M. Brown and Macklin, Brown & Van Wyck, all of New York City, on the brief), for appellees Mulqueen and others.

Before JOHNSON, Circuit Judge, and BROWN and HALE, District Judges.

JOHNSON, Circuit Judge. This is an appeal from a decree of the District Court of Massachusetts in which the appellant, as owner of the steam tug De Witt C. Ivins, was held solely at fault for the loss on December 11, 1916, of the barges Frances Mulqueen, Electra, and St. Daniels and their cargoes of coal, under a contract by the tug to tow them from New York to Boston.

The owner filed a petition for limitation of liability in case the tug should be found at fault, and this was allowed. The only question raised by the appeal is whether the loss was occasioned by the negligence of the tug in the performance of the contract of towage.

[1] The barges were the ordinary wooden box barges of the usual type and construction, designed chiefly for transportation within harbors and inland waters, and it is common knowledge that, because of their blunt bows and box like structure, they can only be used in comparatively quiet waters and under favorable conditions.

[2] The tug is not an insurer, but—

"She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in every thing relating to the work until it was accomplished." The Margaret, 94 U. S. 494, 497 (24 L. Ed. 146).

The skill and care to be exercised must be measured by the known hazards of the task assumed. It is well known that these wooden box barges can stand but little sea, and that the tug which has them in tow must take advantage of the most favorable conditions of wind and tide, avoid the hazard of exposing them to heavy seas, and be within reach of a sheltering harbor when a storm threatens.

Although their towage from New York to Boston in the winter season was attended with considerable hazard, yet the record discloses that box barges were being towed between these points through the Cape Cod Canal.

[3] The owner of these barges, in offering them for such a towage, acquiesced in subjecting them to only the hazards which could not

be avoided by reasonable care and skill on the part of the tug, and the tug contracted to exercise that degree of prudent seamanship and skill required to meet the dangers which might reasonably be anticipated.

The barges were comparatively new; the Electra, the oldest, being but six years old, the Mulqueen three, and the St. Daniels two. They were each loaded with about 1,000 tons of coal, and were taken in tow by the Ivins at Newtown creek, off the East River in New York City, on December 8, 1916, to be towed to Boston through the Cape Cod Canal.

New London, Conn., was reached on December 9th, where, because of unfavorable weather conditions, the tug remained with her tow until December 11th, and left at about 9:45 on the morning of that day.

The tow was made up with the barges in tandem, the Mulqueen being next to the tug upon a hawser about 140 fathoms in length; then the Electra, which was hitched to the Mulqueen by corner ropes or spring lines 8 or 10 feet long, extending from each of her bow corners to the corresponding stern corners of the Mulqueen, and also by a hawser fastened to the stern of the latter and secured to a bit on the bow of the Electra, and so arranged that, when it became necessary, the corner lines might be thrown off and the hawser might be run out its full length of about 200 fathoms, or to any desirable length, and then the Electra would be towed by that.

The St. Daniels was hitched in like manner to the stern of the Electra, and supplied with a hawser of the same length and size as that furnished to the Electra. There was a master on each of the barges, and also a woman upon the Mulqueen.

When New London was left the sea was calm, and there was a very light southwesterly wind. The tug was one of sufficient power and well manned and equipped, but with three heavily loaded barges in tow, although they were hitched closely together, was able to make, under the prevailing conditions, only about 3 miles an hour.

When the flotilla arrived off Stonington, Conn., about noon there was a discussion between the captain and the first mate of the tug as to whether they should proceed or go into that harbor. The weather conditions had not changed since morning, and, although they knew they would meet an ebb tide across Narragansett Bay after passing Point Judith, they decided to continue on. Point Judith was reached at 7:30 in the evening, and it was then within about an hour of high tide, so that there would be an ebb tide for most of the passage to Newport, and the master of the tug knew, or should have known, that if the wind got around into the southeast or east it would kick up a choppy sea.

The witnesses do not agree as to the weather conditions at this time. The weather report from the Point Judith weather station shows that at 5 o'clock that afternoon the wind was strong and the sky cloudy, and at 8 o'clock the wind was fresh and it was cloudy.

One of the masters of the barges had died before the trial in the District Court. The other two testified that the weather was threatening and the wind had increased and had drawn around more to the

eastward. The captain of the tug testified that soon after getting by Point Judith buoy the wind freshened and had got around more to the eastward and that it began to rain a little. The first mate of the tug testified that the sky was "smurry" and there were indications that conditions might grow worse. All agree, however, that the wind increased and blew from the southeast or east after Point Judith was passed, and that, meeting the ebb tide, it caused a choppy sea.

The tug continued on at full speed without lengthening the hawsers between the barges; her captain thinking, as he testified, that "the barges should have been able to stand what little choppy sea there was." After covering about half the distance of 8 miles between Point Judith and Newport, at about 9:45, the St. Daniels, the rear barge, broke adrift. Her master had come off on to the Electra ahead, and gone to the Mulqueen for the purpose, as he testified, of signaling the barge that the St. Daniels was straining at her fastenings and pounding badly against the stern of the Electra. When he came back from the Mulqueen to the Electra, he found that the St. Daniels was adrift. The captain of the tug, when he saw that the St. Daniels was adrift, for the first time, as he testified, blew the signals which he had instructed the barge masters before he left Newtown creek would be given when he wished the hawsers between the barges lengthened. The hawser between the Mulqueen and the Electra was not lengthened, presumably because the man and woman who were aboard the Mulqueen, which was then in a sinking condition, were trying to get aboard the Electra. At 10 o'clock the Mulqueen went down so quickly that it was necessary to cut the hawsers connecting her with the tug, and also the corner lines and the hawser between her and the Electra. That the master of the Mulqueen and the woman on her were able to go from her to the Electra, and that the master of the St. Daniels, before that went adrift, was able to pass from his barge to the Electra, and from that to the Mulqueen, and then back to the Electra, is conclusive proof that, in the choppy sea, these heavily loaded barges must have banged against each other and surged and strained against their connecting lines.

After the Mulqueen sank, the tug, with a hawser of 60 or 80 fathoms, attempted to tow the Electra, which now had the other barge masters and the woman on board; but after doing so for a short time, estimated at from 15 to 30 minutes, the people upon the barge, by their outcries, indicated that she was in distress and the tug came about and took them off. The Electra soon after sank with her cargo.

The master of the St. Daniels testified that the barge "seesawed" as it was drawn by its corner hawsers and bumped against the Electra, and it must also have been true that the Electra must have "seesawed" upon its fastenings and bumped against the Mulqueen ahead of it.

The master of the Electra testified that he heard the corner fastenings which held the St. Daniels to the Electra snap, and that the bridal of the hawser which held the St. Daniels to the Electra had parted on both the cleats on the stern of the Electra where it was attached. If the strain was sufficiently strong to cause these heavy lines to snap, which were new manilla, 8 or 10 inch rope, it is obvious that both the

barges ahead of the St. Daniels must have been subjected to violent wrenching and straining.

This was the first time that the captain of the tug had been around Point Judith with loaded box barges, and he was able to give but one instance in which he had ever towed such barges. It is evident from his testimony that he thought they were able to stand any sea that might be encountered going across Narragansett Bay, under the conditions that would be likely to arise, even if they were towed hitched closely together. Though lengthening out the hawsers would materially impede progress, this did not justify him in subjecting the barges to the much greater strain from towing on short lines and the consequent danger of bumping against each other.

Both the first and second mate of the tug testified that the hawsers should have been lengthened after passing Point Judith; that the weather conditions were such that they expected matters would get worse; that holding these heavily loaded barges with their blunt ends up against a choppy sea by short corner hawsers would strain them violently and cause them to bump together; or, as testified by the second mate, they were likely to "bump their heads off."

The following, taken from the testimony of the first mate, expresses his opinion:

"Q. It is your opinion that the side lines had a tendency to strain—to cause a strain? A. Yes, sir.

"Q. Just how would that occur? A. Well, the action, one in opposition to the other, brings a heavier strain on those lines. If they were good, strong lines, that would naturally bring a heavy strain on the bitts, and the bitts are placed in a position on the corner of the barge, and it would naturally make a wrenching strain. And, further than that, being tied in that space between, she surged back—naturally, when she surged back, and then the lines came taut, and held her, and then she comes ahead—if she comes ahead enough, the two are liable to come together.

"Q. That made it very dangerous after you hauled up around the buoy—having these side lines? A. Yes; after it become rougher, out in the tideway, and the opposite wind.

"Q. Whereas, if they had been out on a long hawser, that danger would have been removed? A. It would have been certainly a relief to the condition of the barges; and it is possible, of course, that it might have helped the situation out greatly, so that it would have avoided some of the trouble.

"Q. That is the way they should have been—out on a hawser? A. Of course, there is no person knows whether those barges were caused to leak and settle in the water so low that the water moved the hatches—whether it was from coming in contact or not, but we naturally supposed it was."

The testimony of experienced seamen, who testified as experts, was to the same effect.

The captain of the tug testified that it was the duty of the masters of the barges, without any command from him, to lengthen the hawsers between them, if they thought they were in danger of being strained or of bumping together upon short lines, and it is sought to relieve the tug from liability because they did not do this.

[4] The captain of the tug was in sole command, and it was his duty to arrange the barges in the tow as he deemed best for their safety and to determine the length of hawser between them, under all conditions. The Quickstep, 9 Wall. 665, 19 L. Ed. 767; The Margaret, 94 U. S.

494, 24 L. Ed. 146; The Fort George, 183 Fed. 731, 106 C. C. A. 169; Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The Manhattan, 186 Fed. 329, 331, 108 C. C. A. 407; The Teaser, 246 Fed. 219, 158 C. C. A. 379; The J. L. Miner (C. C. A.) 260 Fed. 901, 902.

We think the captain of the tug was negligent in not causing the hawsers between the barges to be lengthened, when he knew that, with the wind and tide opposed, he would run into a choppy sea after passing Point Judith, and that the finding of the District Court "that the tug was gravely at fault for attempting to make the passage from Point Judith to Newport with the barges on short lines, is too clear to require discussion," is fully sustained by the evidence.

The evidence disclosed that, before leaving Newtown creek, the captain had instructed the masters of the barges what signals would be given by the tug when it became necessary to lengthen hawsers.

While there is some conflict in the testimony, we accept that of the captain before the inspectors at Providence, R. I., two days after the accident, and repeated at the trial, that no signals were given by the tug to lengthen the hawsers until the St. Daniels had gone adrift.

In the condition in which the barges must then have been, and considering the concern of those aboard of them for their own safety, it is not surprising that the order was not executed; nor does it seem probable that, if it had been, the loss of the barges would have been prevented.

The captain of the tug ascribed the loss of the barges to defective hatches, which came off and allowed the water to pour into them as they were washed by the sea. When the Mulqueen went down, the captain of the tug testified that none of her hatches had come off. In all probability her sinking was caused by the opening of her seams and butts, caused by the straining and bumping which she had received.

When the Electra went down, some of her hatches had come off, which does not seem surprising, in view of the strains and bumping to which she had been subjected from her being fastened, with short hawsers, both to the Mulqueen ahead and to the St. Daniels at her stern.

[5] We are of the opinion that the tug alone must be held responsible for the fact that the barges were exposed to unnecessary strain and danger of bumping against each other through the failure to lengthen the hawsers, and that this is sufficient to account for the breaking away of the St. Daniels and her subsequent stranding, and for the sinking of the other barges.

We are of the opinion that the evidence fails to maintain the tug's contention that, irrespective of the length of the hawsers, the barges would have been filled and sunk by the wash of the seas.

The decree of the District Court is affirmed, with costs to the appellees in this court.