**THE TUG JOHN F. LEWIS COMPANY et al. v. ARUNDEL CORPORATION.**

(Circuit Court of Appeals, Third Circuit. June 10, 1926. Rehearing Denied Dec. 2, 1926.)

No. 3477.

1. Towage ⬅4.

Tug, engaged in towing scows, was not common carrier or insurer.

2. Towage ⬅15(2).

In order that recovery might be had for damage to scows when being towed, it is necessary that scows establish negligence on part of tug.

3. Towage ⬅15(2)—Evidence held to show that tug was properly navigated, and that stranding of tug and tows resulted from weather and channel conditions on attempt to enter harbor to save tow.

Evidence *held* to show that tug was being properly navigated, and that stranding of tug and tows resulted from weather and channel conditions on attempting to enter harbor to save tow, and was not caused by bad seamanship.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Libel and petition for limitation of liability by the Tug John F. Lewis Company and others, owners of the steam tug John F. Lewis, against the Arundel Corporation, owner of scows Nos. 19 and 31. Decree for respondents, and petitioners appeal. Reversed and rendered.

Otto Wolff, Jr., of Philadelphia, Pa., for appellants.

Howard M. Long, of Philadephia, Pa., for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case involves a claim for damage to two scows lost and injured while being towed by a tug. The pertinent facts of the case are as follows:

On October 6, 1922, the tug John F. Lewis took the scows from the Delaware river in tow for Norfolk, Va. The scows had no one aboard, were towed tandem, and, with their hawser lines and bridles, themselves and the tug made a line of some 2,600 or 2,700 feet. On the afternoon of October 7th the tug encountered a rough sea and head winds, and its speed was lowered in ease of the tow, as the scows had begun to ship considerable water. On the morning of the 8th, as conditions had grown worse, it was decided to turn back in hopes of running into better weather. Instead, the weather grew worse, and in the afternoon the tug determined to seek refuge at Schincoteague Harbor, which was the only available one.

At the mouth of this anchorage, the channel, which was about 900 feet wide, passed between Fishing Point and Williams Shoal, and the dispute centers on what took place at that point, as it was there the tug stranded on Williams Shoal where scow No. 31 sustained considerable damage, and scow No. 19 was lost. On the part of the scows, it is contended, as stated in the pleading, "that those in charge of said tug improperly navigated her and her tows, and proceeded too far to the westward, and thereby brought the tug and scows up to the shoals, where they became stranded." On the part of the tug, it is contended that the tug, having proceeded on a proper course and entered this narrow channel, was there navigated in the way customarily employed by tows there entering that harbor; that while she was so entering, and in sufficient water, the waves rose to such height and went to such depth that the tug pitched and struck bottom; that she immediately reversed her engines, and after backing her own length her propeller fouled with the hawser, rendering her entirely helpless; and that thereafter the tug and tow, under stress of the sea, were helplessly carried over to Williams Shoal and there stranded.

The dispute between the parties seems to center on the question of fact, whether the tug initially stranded on Williams Shoal

while proceeding on her course, or whether her mishap was caused by her striking in the channel and there fouling with the hawser, after which she drifted over to and stranded on Williams Shoal. The testimony was heard in the court below by the late Judge McKeehan, so that the trial judge below, as well as ourselves, had not the advantage of seeing and hearing the witnesses.

[1, 2] We start our inquiry with the legal principle that the tug was not a common carrier or an insurer (The Margaret, 94 U. S. 494, 24 L. Ed. 146; Aldrich v. Pennsylvania R. Co., 255 F. 330, 166 C. C. A. 500), and that the burden is on the scows to establish negligence on the tug's part. Turning to the facts, the proofs show that this channel pass, where the difficulty occurred, was narrow; that it was subject to strong currents, and its sands were continually shifting; that in rough weather the seas became rougher and higher as the channel narrowed; that there was a heavy undertow, and that proper navigation required a tug entering with a tandem tow to veer over from Fishing Point, where the water was deep up to shore, toward the other shore, where the water gradually shoaled, and this so as to enable her following scows to round Fishing Point. The proofs show the tug was properly manned—the captain at the wheel, the first mate and the chief engineer on watch, and in addition, though not on watch, the second mate was on deck, and the assistant engineer was on hand; the latter stating that they recognized it as a "bad place." Before reaching this pass, the tow passed a channel bell buoy located in midchannel. The wind was blowing some 34 miles an hour; the captain was familiar with the channel, having entered it with tows from 12 to 15 times in the two preceding years. The government charts indicated 18 feet in the channel and the tug drew 13½ feet. After passing the bell buoy, the first mate, by directions of the captain, took soundings and reported successively 4, 4½, and 4¼ fathoms. The last sounding he reported was 3 fathoms, immediately following which the tug struck a hard blow on bottom. She did not stick or strand from this impact, but rose and fell with the motion of the water. The captain immediately signaled to reverse, and the tug responded by moving sternward about 100 feet. Here her propeller fouled the 8-inch hawser, which wound around it, and the tug became helpless. From that point, she and the tow were carried by the wind and waves from 500 to 600 feet, over to Williams Shoal, where they all stranded.

This account is testified to by those on the tug, who were the only on the spot witnesses. The captain and the two licensed mates, all experienced men, give this account, and with the engineer make certain the fact of this one initial blow; that the vessel did not then stick; that she was backed, and thereafter fouled the hawser. Their testimony is that the pitch of the vessel, the high sea, and the depth of the waves all combined to cause this tug, which was drawing 13½ feet, to strike the bottom at a place where, in ordinary conditions and by the chart, there was some 18 feet of water.

We find nothing in the case to really and substantially contradict this testimony, or to afford any substantial grounds for questioning its probability and possibility. We find that this striking of the tug was caused, not by bad seamanship, but by the water, wind, and character of the waves, centering in, and increased by, the narrowing channel. Nor do we think that this is disproved by the testimony of the Coast Guard people. The Coast Guard station was located about 3½ miles from the place where the tug struck. The Coast Guards all agree that the tug was following the usual course of tows entering the harbor, and indeed there is no testimony to the contrary. While they saw the vessel coming up, they were not close enough to observe this first striking, and what really attracted their attention was the subsequent movement of the tug and the scows over toward the place where she was very quickly stranded on Williams Shoal. Their testimony, as a whole, was thus directed to where they saw the tug and the tows when they were stranded, and they naturally looked on that particular place as the place where the mishap occurred, while, in point of fact, the real cause of the mishap was, not their stranding finally on Williams Shoal, but the fact of the tug striking the bottom several hundred feet away from it, and being then and there so crippled by the fouling of the propeller and the hawser that they all drifted across to Williams Shoal.

[3] Taking the testimony as a whole, we have reached the conclusion that the tug was being properly navigated, and that the stranding of the vessels was not caused by bad seamanship, but resulted from the proper maneuvering of the vessel in the face of the weather, water, under-tow, and channel-shifting conditions that confronted her on attempting to enter a harbor, which she was compelled to seek to save her tow.

The decree of the court will therefore be reversed, and the claim of the scows disallowed.

On Petition for Rehearing.

PER CURIAM. In denying the motion for a rehearing in this case it is due the zeal and thorough preparation of counsel to say that the court had not overlooked any of the arguments and testimony which are now called to our attention in the motion to rehear. The case was individually and independently studied by the members of the court who heard the case, and each arrived at the conclusion later announced, and while the contentions of counsel mentioned in the present motion were not specifically referred to in the opinion filed, they were all duly considered in arriving at the court's conclusion. That conclusion we are satisfied was the right one, and therefore the motion for rehearing is now denied.