THE DORIS ECKHOFF.[1]

LOUD *v.* THE DORIS ECKHOFF, and Owners of the Steam-Tugs John G. Stevens and R. S. Carter.

*(District Court, S. D. New York. July 2, 1887.)*

1. COLLISION—VESSELS IN TOW—RESPONSIBILITY OF TOW—JOINDER—IN REM AND IN PERSONAM.

    A large vessel in tow, and in charge of her own master and crew, who participate in and in part control the navigation, is jointly liable with the tug for a collision caused by navigating in violation of the state statute, when no protest is made by the master, nor any timely effort to correct the fault. In the absence of one of the vessels, the owners may be joined under rule 59 as defendants along with the other vessel *in rem.*

2. SAME—EAST RIVER NAVIGATION.

    Vessels navigating the East river must go in mid-stream, or as near thereto as may be, as required by the statute of the state of New York.

3. SAME—TWO TOWS—CROSS-TIDE—CARELESS NAVIGATION.

    The schooner Flint was going up the East river with the flood-tide, in tow of the tug Stevens, some 400 or 500 feet from the New York shore, and had reached a point opposite Corlear's Hook. The bark Doris Eckhoff, coming down the river in tow of the tug Carter, was in the eddy tide above the Hook, and about 100 or 200 feet from the shore. At this point in the river the flood-tide takes a strong set towards the Brooklyn shore. When about 400 yards apart the tugs had signaled once to each other, with intent to pass port to port, but the cross-tide carried the bark to port, and she ran into and sank the schooner. *Held,* (1) that both tugs were in fault for disregard of the state statute requiring vessels in the East river to go "in mid-stream, or as near thereto as may be;" that they were also in fault in not exchanging signals earlier, and in attempting to pass so close to each other in that part of the river; (2) that the bark in starboarding as she was running into the true tide, was faulty in her navigation, and was not exercising that care and skill which were known to be necessary at that point, and which if observed, would have avoided this collision; (3) that the schooner, whose master and crew were on board, participating in her navigation, and which received the injury while proceeding in a part of the river forbidden by law, should for that reason bear a part of the loss.

In Admiralty.

*Geo. A. Black*, for libelants.

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

*Goodrich, Deady & Goodrich*, for the bark.
*James W. Osborne*, for the tugs.

BROWN, J. The libel in this case was filed to recover damages aris-
ing from a collision in the East river, a few·hundred feet below Corlear's
Hook, at about 10 A. M. on the morning of March 8, 1886, between the
libelants' schooner C. R. Flint, and the bark Doris Eckhoff. The Flint
was going up river with a strong flood-tide, in tow of the steam-tug J.
G. Stevens, upon a hawser of 40 fathoms. The bark was coming down
the river, upon a hawser of about the same length, in tow of the tug R.
S. Carter. The Stevens and the schooner were proceeding up river about
one-third the distance across from the New York shore. The Carter,
with the bark, was coming down river from above the Hook, still nearer
to the shore, and in the eddy tide. Off Corlear's Hook, they were from
100 to 200 feet only off the New York shore. From the Jackson-street
pier, a few hundred feet below, the flood-tide takes a strong set across
towards the Brooklyn shore, running probably three knots. The tugs
were approaching each other at about the rate of 10 knots, and, when
only about 400 yards apart, each had given one blast of the whistle, in-
dicating that they would pass port to port. Doubtless they would have
done so safely, except for the effect of the cross-tide upon the Eckhoff.
As the Carter and the Eckhoff, on rounding the Hook, struck the strong
cross-current of the flood-tide, they were both deflected to port, and the
bark, unable to keep her former direction, ran into the schooner, in con-
sequence of which the latter sank not long after. The libel was orig-
inally filed against the bark and the two tug-boats, alleging fault in all.
Only the bark, however, was arrested under the process of this court; the
two tug-boats having been previously seized under process in the Eastern
district, and thereunder sold. Afterwards, upon petition by the claim-
ants, under the fifty-ninth rule of the supreme court in admiralty, the
owners of the two steam-tugs were made parties defendant *in personam*,
and they subsequently appeared and answered.

Without referring to the numerous details that appeared upon the
elaborate trial of the cause, the following faults contributing to the col-
lision seem to me to be clearly established:

1. The Stevens and the schooner were not going "in mid-river, or as
near thereto as may be," as required by the state statute; but at the time
of the collision were not more than 400 or 500 feet from the New York
shore. Their contention that they could not go further out on account
of ice is not, in my opinion, sustained by the proof. After the collision,
there was not ice sufficient to prevent the schooner's reaching the Walla-
bout, towards which she headed as soon as collision was feared. Although
the distance from the shore might be deemed sufficient to allow the Carter
and the bark to have passed in safety in an even tide, the strong cross-
tide made this distance insufficient and unsafe; and the disobedience of
the statutory requirement was therefore a fault contributing to the col-
lision. *The Maryland*, 19 Fed. Rep. 551.

2. The tug Carter was guilty of the same fault for hugging the New

York shore. This fault alone would not have caused collision, but, being there, instead of keeping there, she sheered towards the Brooklyn shore sooner than, under the circumstances, she was justified in doing; and she also slackened her speed unnecessarily, as she went into the cross-tide, whereby the hawser was much slackened, and the bark thereby deprived during a few critical moments of the tug's aid in keeping to starboard out of the way of the schooner. The weight of evidence satisfies me that the tug headed towards the Brooklyn shore, just astern of the schooner, by her own volition, and not through the effect of the cross-tide, or in spite of what the tug might have done to keep to starboard.

Both tugs were further in fault for not exchanging signals earlier, i. e., half a mile apart, as required by the inspector's rules; and for attempting to pass so near each other, port to port, in that part of the river, where the strong cross-tide was certain to create considerable deflection in the course of the bark in tow on such a hawser. The nearness of each to the shore probably prevented each from seeing the other as soon as they ought to have been seen, and this prevented timely signals. *The Maryland, supra.*

3. I am not satisfied that the Eckhoff used the prudence and skill that were incumbent on her, and were easily within her power, in passing from the eddy into the strong cross-tide. It was imprudent, and I must regard it as a fault, for the bark to starboard the helm, as she did, at about the time when she was just running into the true tide, when she could not possibly pass ahead of the Stevens and her tow, and when this starboarding, and the effect of the tide, were both calculated to throw her directly upon the course of the schooner. The only excuse offered is that she headed directly after the tug. This is doubtless right in a true tide, and where such a course would have no tendency to precipitate a collision. It was manifestly wrong in this case, because, in order to keep directly after the tug, it was necessary that the schooner should port her helm, rather than starboard it, at the moment, or a little before the moment, when she began to enter the strong tide that swept across her starboard bow. Instead of that, her helm was at first put to starboard, which increased the effect of the strong tide, and made her subsequent port helm wholly ineffectual to avoid the Flint. In this faulty use of her helm the case is analogous to that of *The Virginia Ehrman*, 97 U. S. 309, 315. As in that case, also, there seem to me strong indications that the bark was not keeping a proper lookout, nor taking those precautions which it was well known were necessary in passing into the cross-current at this place. Though the master was on board, he did not observe the whistles exchanged between the tugs; and if the mate was on the lookout, as alleged, no hail was at any time received from him. The wheel was first starboarded by the wheelsman without any direction or counter-order by the master, who was near him and ought to have observed that it was dangerous to starboard the helm. These circumstances together convince me that the bark was not conducting her own part of the navigation with necessary regard to the special circumstances of the place, and did not exercise that reasonable care

and skill which were known to be necessary at that point, and which, if observed, would, I think, have avoided this collision.

4. A more difficult question is whether the schooner is to be held jointly answerable for the damage caused, as I have already observed, in part by the fact that both the tug and schooner were not more than one-third of the distance from the New York shore, instead of being in mid-river, as required by law. The injury was received by the schooner while she was navigating in an unlawful place. Upon the general principles and analogies of the maritime law, the schooner, as the offending thing, would be held in fault, and answerable to third persons, when her navigation was faulty, and the injury did not happen by inevitable accident. Looking to the maritime law alone, the mere fact that the owners might not be chargeable with any personal fault, or themselves stand in any relation of personal responsibility, would not exempt the ship, which is regarded by the maritime law as responsible to third persons for her proper navigation by whomsoever conducted. As respects third persons injured by the faulty navigation of a vessel, it is immaterial what arrangement the owners of the offending vessel may have made in respect to her navigation,—whether by a master and crew engaged by themselves, or by a master and crew engaged by a charterer to whom the vessel may have been let by a contract of charter, or by a tug-boat with which the owners may have contracted for the navigation of the vessel from one place to another. This rule is applied without question in cases of charter-parties, where the possession of the ship is delivered to the charterers, who navigate her on their own account exclusively, through persons employed by them, without any right of selection or control by the owners. In all such cases, the ship, to her whole value, is chargeable for any faults in her navigation or management that cause injury to herself, or to other vessels, or to the cargo of either. It is no defense to the ship that those having charge of her are in no respect under the direction or control of the owners. The ship is regarded as the offending thing, to which persons suffering from her management and navigation are entitled to look for redress; and the owners of the ship must look for their indemnity to the persons in whose charge they have voluntarily placed her. So the faults of a pilot compulsorily taken are by the law of this country faults of the ship, for which the ship is held answerable in damages.

The analogies to be drawn from these undoubted cases of charter-parties, and from the well-settled law of this country holding the ship responsible for the faults of a pilot compulsorily taken on board, would seem to favor the right of third persons to look for redress directly to the ship that does the damage, though a tow, leaving the owners of the latter to their legal remedy against the tug in whose charge they have placed her. There are also important practical considerations of general policy and justice which would sustain this claim of third persons to resort to the offending ship; for otherwise the owners of large ships may escape all responsibility for the injuries inflicted upon other vessels, by simply making a contract of towage; and when other vessels and their

cargoes sustain great losses, through the fault of the tug, since the tug is usually of comparatively small value, the injured parties, under the limited liability act, would have no adequate redress. It would seem to be just that the navigation of large vessels should not by this means be allowed to be conducted with comparative impunity for any damage inflicted on others, but that the tug should be held to be only the servant of the ship that employed her.

Consistently with this view, the English authorities hold that a ship in tow of a tug is liable for her injuries to third persons, though the direct fault may be that of the tug alone. The existence of a contract of towage does not prevent the ship and her owners from being treated as principals, as respects third persons. Macl. Law Shipp. 287; *The Energy*, L. R. 3 Adm. & Ecc. 48; *The Sinquasi*, L. R. 5 Prob. Div. 244; *The Mary*, Id. 16; *The Belknap*, 2 Low. Dec. 283.

In this country, upon the view taken of the law of principal and agent only, in connection with the contract of towage, the tug is held to be the sole principal, and the ship exempted, when her navigation is, by contract, exclusively in charge of the tug. *Sturgis* v. *Boyer*, 24 How. 110. The supreme court, however, not only in the case last cited, but in several subsequent cases, have been apparently careful to limit this rule to the facts existing in that case; namely, where the ship was in the exclusive charge and control of the tug, without officers or men of her own in any way participating in the ship's navigation. Thus, in *The Virginia Ehrman*, 97 U. S. 309, 313, Mr. Justice CLIFFORD says: "Cases arise undoubtedly where both the tug and the tow are liable for the consequences of a collision, as when those in charge of the respective vessels *jointly participate in their control and management*, and the master or crew of both vessels are either deficient in skill, fail to take due care, or are guilty of negligence in their navigation." See *The Mabey*, 14 Wall. 204; *The Civilta*, 103 U. S. 701. In the case of *The Belknap*, 2 Low. Dec. 281, LOWELL, J., to some extent reviews the various decisions on this subject, and comments upon the uncertain and unsatisfactory condition of the law.

In the case of *Sturgis* v. *Boyer*, *supra*, neither the master nor the crew were on board; the entire management of the ship was with the tug. In the present case, the master and crew were all on board, participating in, if not controlling, the navigation of the schooner. There is no evidence of the relations of the parties, except the mere fact that the tug had the schooner in tow under some contract to take her up the East river. In such a case, doubtless, the general direction of the course of the two vessels is determined by the tug. The tow follows her lead. But the tug, in directing her course out of the middle of the river, contrary to law, was at the same time violating her implied contract of towage. The tow was not bound to acquiesce, and to follow the tug, rather than obey the statute. A large vessel like the Flint has it in her own power to control very considerably her own course and that of the tug. She is bound to exercise this power, so far as she reasonably can, when she is being directed illegally by the tug, to the imminent peril as in this case of

other vessels. Had the Flint done so, by a timely porting, this collision would probably have been avoided. The tug and tow, moreover, were within hailing distance of each other. Orders were given from time to time from the tug to the schooner. Can it be assumed that any request or requirement from the master of the schooner to the tug, that she should proceed in mid-river, where the law required, would be unheeded? The master of the schooner testifies that they were going up one-third of the distance from the New York shore. Had they gone a little further towards mid-river this collision would have been avoided. It would probably have been avoided had the Flint earlier ported strong, even without communication with the tug. The circumstances show at least an acquiescence on the part of the master of the schooner in the illegal course taken by the tug. Had there been any attempt by the master of the schooner to go in mid-river, as the law requires, or any request to the tug to do so, which the tug disregarded, the case would be different. The Flint, by her master and crew, participated in navigating the vessels in a way that was contrary to the statute, and in a position that was plainly perilous to other vessels, and the master made no use of the means in his power to correct the error until too late.

The libelant is entitled to recover half his damages against the bark and the owners of the steam-tugs. The latter, having set up the statutes in limitation of liability, are entitled to the benefit of those statutes, so far as they extend, if the owners are not personally in fault.

A reference may be taken to compute the damages.