## THE DORIS ECKHOFF.

### LOUD et al. v. THE DORIS ECKHOFF.

(Circuit Court of Appeals, Second Circuit. January 18, 1892.)

COLLISION—TUGS AND TOWS—RESPONSIBILITY OF TOW.

A bark and a schooner were each on a hawser in tow of a tug in the East river. Each tow had her master and crew aboard, who, however, were not taking charge of her navigation, but, on the contrary, were receiving and obeying orders from the tugs, and each tow was following in the wake of her tug. The tugs, however, were not proceeding in the middle of the East river, as required by statute, but were near the shore. The bark and the schooner came in collision by reason of fault on the part of the tugs, neither the bark nor schooner doing anything to contribute to the collision. Held, that the tows were not chargeable with participation in the fault of the tugs in navigating in a forbidden part of the river. 32 Fed. Rep. 555, affirmed.

In Admiralty. Appeal from a decree of the circuit court of the United States for the southern district of New York, affirming *pro forma* a decree of the district court for said district, which held in fault both tugs and both tows for the collision described in the opinion. 32 Fed. Rep. 555. And see 41 Fed. Rep. 156. Both tows appealed to this court, the tugs not appealing. Reversed.

*George A. Black,* for libelants, appellants.

*Goodrich, Deady & Goodrich,* (*William W. Goodrich,* of counsel,) for claimants, appellants.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. On the morning of March 8, 1886, about 10 o'clock, a collision occurred between the bark Doris Eckhoff, in tow of the tug R. S. Carter, and the schooner C. R. Flint, in tow of the tug John G. Stevens. The damage to the Flint and cargo was about $12,000 to $13,000; to the Eckhoff, about $300. The Flint brought action against the bark and both tugs. The tugs were not attached, on account of their leaving the jurisdiction, and the marshal only seized the bark. On petition of the owners of the bark, the owners of the tugs Sherman and Hughes were made respondents, and brought into this action. These two were the joint owners of both tugs, and Sherman was master of the Stevens, and in charge of her navigation at the time of the collision. After the escape of the tugs from the jurisdiction, they were libeled in Brooklyn, and made default, but lienors for supplies intervened, and contested the priority of the liens, and libelants collected, after a long litigation, from the proceeds of the R. S. Carter, about $2,000. All claimed the benefit of the limitation of liability provided by section 4283, Rev. St. U. S.

The day was fine, with but little wind. The tide was strong flood. The bark, in tow of the Carter, on a hawser of 40 fathoms, was going down in the eddy, close to the New York shore. The schooner, in tow of the Stevens, on a hawser of 40 fathoms, was going up the East river, about one third of the distance from the New York shore. The river makes a bend at Corlear's Hook, which may be roughly stated to extend from Grand street to Jackson street. On the flood tide there is an eddy which commences at Jackson street, and extends, in a V shape, up to Grand street ferry, where it is from 250 to 300 feet wide. The true tide, outside that, runs with great strength, four or five miles an hour, and is broken up into what some of the witnesses call "whirling pools" or eddies, which vary with different conditions of tide and wind, so as to render the navigation of this part of the river somewhat hazardous,— a fact well known to navigators in these waters. The several expert witnesses for both sides testify that the safest course for a vessel coming down the river under these circumstances is to keep out in the middle of the river, so as to avoid striking this tide with the starboard bow. The Carter and her tow rounded the bend of the river, passing through the slack water, and, as the bark reached the true tide, she took a rank sheer to starboard, and came into collision with the Flint. The district

judge held all four vessels in fault, and the owners of the bark and of the schooner have appealed. As the district judge held both tugs in fault, as neither of them has appealed, and as no one suggests that they were not in fault, that proposition may be accepted without any further discussion of their navigation than such as may be necessary to determine the question raised on this appeal. The answer of the bark charged the schooner with fault, in that, seeing a collision imminent, she did not port her wheel. We do not find in the evidence sufficient to sustain this charge. On the contrary, she did port her wheel, and thus endeavored, though unsuccessfully, to avoid collision. That she was not so far over towards mid-river as to be out of the way of the Eckhoff was a consequence of the navigation of her tug. The district judge, however, held the schooner, because both tug and schooner were not more than one third of the distance from the New York shore, instead of being in mid-river, as required by the state statute, (chapter 321, p. 450, Laws 1848,) in other words, because "she was navigating in an unlawful place." Her master and crew were aboard. She was being moved through the harbor under the ordinary contract of towage, by which "the owners of the tow do not necessarily constitute the master and crew of the tug their agents in performing the service, as they neither appoint the master of the tug, nor employ the crew, nor can they displace either one or the other. Their contract for the service, even though it was negotiated with the master of the tug, is, in legal contemplation, made with the owners of the vessel employed, and the master of the tug continues to be the agent of the owners of his vessel." *The Clarita*, 23 Wall. 11. So far as the proper navigation of the tow itself is concerned, the law is abundantly settled that she is bound to follow the guidance of the tug, to keep in her wake, and conform to her directions. *The Margaret*, 94 U. S. 494. This the schooner did. The district judge, however, held that the master and crew of the schooner were participating in the navigation, and in fault for not controlling the movements of the tug to the extent of requiring her to proceed in mid-river, either by ordering her to do so, or by endeavoring to swing her over in that direction by altering the helm of the Flint, irrespective of the heading of the tug; that there was "at least an acquiescence on the part of the master of the schooner in the illegal course taken by the tug;" and that as he was present, with his crew on board, steering after the tug, he must be held to have participated in the navigation on that course. We do not find that this proposition is supported by the authorities. The tug was, in fact, under the command and direction of her own master, and received no orders or directions from those on board the Flint. On the contrary, those on the tow received and obeyed orders from the tug. We are unable to distinguish this case from that of *The John Fraser*, 21 How. 184. In that case the Fraser was in tow of the steamboat General Clinch, which navigated with her into such dangerous proximity to an anchored vessel that, upon casting off the hawser, the Fraser was unable to avoid collision. Although she had her master and crew on board, and was attending to

her own helm, she was not held to be participating in the navigation. The court said:

"According to the usage of trade at that port, she engaged a steamboat, well acquainted with the harbor and its usages, to bring her in. * * * The General Clinch was * * * under the command and direction of her own pilot. * * * She could select her own course and her own rate of speed. * * * When fastened to the hawser, and in tow, the Fraser was controlled entirely by the steam tug, both as to her course and speed. The steamboat was not subject to the orders of the commander of the John Fraser, but was altogether under the control and direction of her own commander. * * * The Fraser could do nothing more than watch the motions of the steamboat, and use her own rudder, so as to keep as nearly as might be in the wake of the tug to which she was attached."

—And held that the collision was not caused by any fault or negligence on the part of the Fraser, and that she was not answerable for the consequences of the improper navigation of the Clinch. We do not find any qualification of the rule laid down in this case in any subsequent decision.

In *Sturgis* v. *Boyer*, 24 How. 110, the vessel in tow had on board only her mate and a gang of stevedores, and was held not in fault for a collision. The court said:

"Cases arise undoubtedly when both the tow and the tug are jointly liable for the consequences of a collision, as when those in charge of the respective vessels jointly participate in their control and management, and the masters or crews of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. Other cases may well be imagined when the tow alone would be responsible; as when the tug is employed by the master or owners of the tow as the mere motive power to propel their vessels from one point to another, and both vessels are exclusively under the control, direction, and management of the master and crew of the tow. * * * But whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which for the time being has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage through the fault of those in charge of the vessels must, under such circumstances, look to the tug, her master or owners. * * * Assuming that the tug is a suitable vessel, * * * so that no degree of negligence can attach to the owners of the tow on the ground that the motive power employed by them was in an unseaworthy condition, the tow, under the circumstances supposed, is no more responsible for the consequences of a collision than so much freight; and it is not perceived that it can make any difference in that behalf that a part, or even the whole, of the officers and crew of the tow are on board, provided it clearly appears * * * that from the nature of the undertaking, and the usual course of conducting it, the master and crew of the tow were not expected to participate in the navigation of the vessel, and were not guilty of any negligence or omission of duty by refraining from such participation."

In *The Mabey and Cooper*, 14 Wall. 204, the tow was held in fault as well as the tug; but the ship in that case ordered the tug to take her to sea in an unfavorable state of the wind and tide, and when navigation was dangerous, and the tug consented to go to sea only upon the ship's

owners insisting upon the towing, and upon their agreeing to take the risk of all accident, the collision being a direct consequence of this improvident action, as the ship was unexpectedly caught in an immense field of floating ice, which, in spite of the power of the steam tug, swept her against libelants' ship. "Want of due care," said the court, "is shown in the fact that the ship went to sea at a moment when * * * it was not safe, in view of the condition of the weather and tide."

In *The Virginia Ehrman*, 97 U. S. 309, the tow was held in fault, not for navigating with the tug in too close proximity to anchored dredges, but because she might herself have prevented the collision by a timely starboarding of her own helm.

In *The Civilta*, 103 U. S. 699, 701, the ship had a pilot on board, and it was expressly found as a fact that the tug was subject to his orders. He was in general charge of the navigation of both vessels, and the court held the ship in fault because he failed to give the necessary directions to the tug to avoid approaching danger. See, also, *The Connecticut*, Id. 710; *The Clarita*, 23 Wall. 1; *Jackson v. Easton*, 7 Ben. 191; *The Galileo*, 28 Fed. Rep. 469.

We are therefore of the opinion that the Flint can no more be held responsible for faulty navigation, because she followed the course of the tug, and did not undertake to direct its movements, though that course lay, not through mid-river, but east of it, than was the John Fraser, because, with her master, helmsman, and crew on board, she followed without undertaking to direct the course of her tug, although that course led her into dangerous proximity with an anchored vessel; and, as no maneuver or omission of her own is shown to have contributed to the collision, we find her free from fault.

For the same reasons, we do not find the Doris Eckhoff in fault, because she followed the course of the Carter, without undertaking to direct or control it, although the collision was undoubtedly caused by the fact that the course selected by the Carter was too close to the New York shore, where her tow was exposed to the effect of tidal currents, which might have been avoided had tug and tow been navigating in the middle of the river. The Doris Eckhoff gave no orders to the tug, but, on the contrary, received and obeyed orders from her. The further charge in the libel that the Carter was not sufficiently powerful to handle the Eckhoff is not borne out by the proof. But it is also contended that improper handling of her own helm co-operated with the set of the tide to cause the sheer which brought her into collision with the Flint. The testimony upon this branch of the case is conflicting. Two witnesses, who were on a third tug (the Allen) going up ahead of the Stevens, testify that the rudder blade of the Eckhoff, at the time she took the sheer, was pointing to the port quarter, that is, that she was under a hard astarboard helm, and that it so continued down to the very moment of collision. This last statement is inherently improbable, and was not credited by the district judge, who finds that her helm was ported, but too late to be effectual to avoid the Flint. The bark was drawing 14 feet of water, and they claim to have noticed the position of its blade at

a distance of 400 or 500 feet. The very extent of the sheer to port may have led them to infer that her helm must have been hard astarboard. Moreover, there is a suggestion of unfriendly feeling between one of them and the captain of the Doris Eckhoff. We are therefore inclined to give credence rather to the circumstantial statement of the captain and helmsman of the Eckhoff than to the evidence of these two independent witnesses. *McNally* v. *Meyer*, 5 Ben. 239; *Steamship Co.* v. *Rumball*, 21 How. 372.

The weight of evidence satisfies us, as it did the district judge, that, after rounding the bend in the river, the Carter, of her own volition, and not through the effect of the cross tide, headed towards the Brooklyn shore, (which is a customary maneuver with vessels making the turn so close to the New York shore,) intending to pass just astern of the Flint, and that, noticing this maneuver, the Eckhoff starboarded to follow her, while herself still in the slack water. While the Carter, no doubt, was in fault, for thus sheering sooner than she should have done, with the Flint so near to herself and her tow, we are not satisfied that the Eckhoff was in fault for following her, in view of the well-settled rule which requires vessels in tow to conform their movements to those of their tugs. *The Galileo*, 28 Fed. Rep. 469. We are further satisfied that, at the moment her bow touched the flood tide, her wheel was heaved hard aport, and kept so, which was proper navigation. That such porting did not operate to counteract the set of the tide was due in part to the fact that it is so strong in that part of the river that, as one of the claimants' expert witnesses testified, it would carry her over towards Brooklyn three or four lengths, no matter how carefully her helm was attended to, but chiefly because, as the tug entered the true tide, its headway was checked, and the hawser slackened, depriving the bark of the assistance she would otherwise have had in checking her sheer. That she was in that part of the river was, as we have found, the fault of the Carter, with participation in which she is not chargeable; that she followed the tug while in the slack water was her duty under the law; and that, as she ran into the true tide with its powerful cross set, she at once hard aported, as she should have done, we are satisfied from the proof. The other averments of fault on the part of the Eckhoff, viz., that she was not properly manned, did not keep a proper lookout, did not anchor, and employed a tug not sufficiently powerful to tow, are not sustained by the proof. We therefore find the Doris Eckhoff free from fault.

The decree of the circuit court is therefore reversed, and the case remanded, with instructions to decree in accordance with the views expressed herein, with costs of the district court to the Flint against the respondents, and no costs of the circuit court or of this court to either appellant as against the other. It should be noted, further, that, as the owners of the Eckhoff filed no libel or cross libel demanding damages, none can be awarded to them; and that as Sherman, who was part owner of the Stevens, was master of her at the time of the collision, he is not entitled to any limitation of liability as respects her share of the loss.