THE TEXAS. THE MARIA HOFFMAN. THE GEORGE W. TRUITT.

(District Court, S. D. New York. November 13, 1911.)

1. COLLISION (§ 61*)—STEAMER AND TUG WITH TOW—NEGLIGENT NAVIGATION OF TUG.

The schooner Truitt, while being towed from Jersey City stern first by a tug on her side to Stapleton Anchorage with an ebb tide, came into collision with the steamship Texas, which was proceeding from the anchorage to Hoboken at a speed of not more than three knots. The weather was hazy, but the vessels saw each other when about half a mile apart, and the tug signaled with two whistles and starboarded. Receiving no answer, she again signaled and kept her course. The Texas at first, owing to the haze, did not see the tug, but supposed the schooner to be anchored, and on seeing the tug thought the schooner was going in the direction she was headed and ported her helm to pass to the eastward of her and also another steamer crossing toward the west shore. She did not hear the tug's signal, but, on finding the direction in which she was headed, at once reversed. *Held*, that she was not in fault, but that the fault was solely that of the tug in persisting in attempting to pass starboard to starboard, which was not justified by the positions of the vessels on somewhat crossing courses with the tug, the burdened vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 58*)—NEGLIGENCE IN TOWING SCHOONER STERN FIRST—FAULT OF TUG.

It is negligence for a tug to tow a schooner stern first for any considerable distance in New York Harbor on a hazy day when other vessels

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

are likely to be misled by the fact; but, where the tow was not consulted, the fault is solely that of the tug.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 68–71; Dec. Dig. § 58.*]

In Admiralty. Suit for collision by George W. Elzey, as master of the schooner George W. Truitt, against the steamship Texas and steamtug Maria Hoffman, and cross-libel by Scandinavian-American Line, owner of the Texas, against the Truitt and Hoffman. Decrees for libelant and cross-libelant against the Hoffman alone.

Mr. Haight, for the Truitt.
Mr. Burlingham, for the Texas.
Mr. Park, for the Hoffman.
Mr. Taylor, for cargo of the Truitt.

HOUGH, District Judge. Concerning some facts there is no substantial dispute, viz.: on January 14, 1911, at approximately 1:08 p. m., the stem of the steamship Texas (380 feet long) came in contact with the port side of the schooner Truitt (175 feet long) somewhat abaft her forerigging, inflicting such injury that the Truitt's cargo of cement was ruined by water, the schooner herself badly cut into, and the steamer's stem twisted to starboard. The tide was ebb, the wind negligible, the place of collision on the westerly side of the channel within a few hundred feet and somewhat to the northward of Bell Buoy 12½.

The Truitt was bound from Jersey City to Stapleton Anchorage in tow of the Hoffman, and was proceeding stern first; the tug being lashed on schooner's port side so that the stern of the latter projected considerably beyond the Hoffman's bow. Before collision, the Hoffman cast off in such haste that some of the lines, if not all of them, were cut.

The Texas was bound from Stapleton Anchorage to a wharf in Hoboken, was fully laden, and has a sea speed of no more than 9 or 10 knots. She hoisted anchor at 12:45 p. m. and got under way at 12:50. These times, as well as that of collision, are taken from the steamer's engine-room log, the accuracy of which record is not impugned. The distance from the Texas' anchorage to the point of collision is less than 5,000 feet, and there is no substantial contradiction of the fact, deducible from the figures above given, that at no time before collision did the speed of the Texas exceed three knots.

From testimony not so unanimous (but nearly so) it is found that the weather, which had been foggy in the morning, was clearing, but was still hazy; vessels could be seen sufficiently for ordinary purposes of navigation at a distance of certainly three-quarters of a mile, but the haze was sufficient to prevent clear vision, and it was thicker below Robbins Reef than it was farther up the river. It is inferred, from the nature of the injuries to both Texas and Truitt, that at the moment of collision the schooner was moving across the steamer's bow toward the latter vessel's starboard, and also that the schooner had much the greater headway (or, to speak more accurately, stern-

way). This result is consonant with the weight of testimony, and particularly with the uncontradicted evidence that at and before collision the Texas was reversing full speed, while the Hoffman shortly before casting off the Truitt had rung a jingle bell ahead in an endeavor to hurry across the steamer's bow.

[1] A view of the seriously contested questions in the case can be best obtained by first considering the story of the Hoffman. It is said without contradiction that at probably four knots an hour she came down the westerly side of the channel, maintaining approximately the channel course until she was off and a little below Robbins Reef Buoy. She then changed direction so as to head toward the Narrows, i. e., she starboarded. At this time her master says he saw the Texas on his starboard bow, and saw that she was heading in such direction as to have the tug on her own starboard bow. In this statement he is supported by the master of the Truitt, and the accuracy of this position as a starting point for navigation is essential to justify the Hoffman's subsequent proceedings; because she then blew two whistles, hearing no answer blew two more, and seeing the Texas evidently swinging to the eastward (or her own starboard hand), the tug's engines were put at top speed under a jingle bell, with the result that a nearly right-angled collision occurred on the easterly side of the channel. This story means that the Hoffman, while leaving the westerly side of the channel, was (in her master's language) chased into a collision on the easterly side of the channel and by the more slowly moving Texas.

The inaccuracy of this fundamental statement is shown (without any reference to opposing testimony) by the diagrams made by the master of the Hoffman and the statement of the Truitt's master that when he first saw the Texas he especially observed her port anchor chain. The diagrams referred to show that the tug blew two whistles when it was off and a little below Robbins Reef Buoy, heading directly for Bell Buoy 12½ and distant about a mile from the Texas. Hearing no answer, two whistles were again blown after the Hoffman had progressed more than half a mile upon the same course and the Texas had moved scarcely quarter of a mile. Finally the vessels are placed in collision in such position that in order to produce contact the Texas must have traveled (after tug's second two-whistle signal) more than three-eighths of a mile while the tug went scarcely more than one-eighth; yet it was during this very period that, according to her own testimony, the tug was pressed to top speed in order to escape. It is concluded from the testimony furnished by tug and schooner alone that when signals were first blown the colliding vessels were not on courses that enabled them to pass starboard to starboard with safety, but were on crossing courses, and the Hoffman was the burdened vessel. She blew two whistles, and, hearing no answer, persisted in the manœuver indicated by that signal. She thereby primarily caused the collision, and is therefore at fault.

The allegations of fault against the Texas are intimately interwoven with the single substantial allegation against the Truitt, name-

ly, that the schooner permitted herself to be towed stern first in hazy weather upon such a voyage as that from Jersey City to Staten Island.

I am inclined to think that the observers on tug and tow saw the Texas slightly before those on the Texas saw them, and it is plain that it was not easy to hear whistles on that day, for the evidence is overwhelming that some whistles were blown on each steam vessel that were not heard on the other. This is not unusual in even light fog. But it is enough for the purposes of the Texas that the observers on that vessel saw the Hoffman and her tow in plenty of time to have avoided collision had all concerned acted with legality and caution. The pilot, master, and first officer of the Texas were all on the bridge, all saw tug and tow dead ahead, or nearly so, at a distance of rather less than half a mile. At the same time they saw to the northward of her the steamer Neidenfels being towed westward across their intended course. The haze was such that they beheld the masts of the schooner first and did not see the comparatively lowlying tug alongside. They were momentarily perfectly justified in thinking that they saw a schooner at anchor, and, when they did make out that she had a tug alongside, they were, in my opinion, further justified in assuming that she was going in the direction her bow was pointing, and that direction, both according to the observers on the Texas and the diagrams made by the master of the Hoffman, was somewhere between northwest and north northwest. Thus seeing the Neidenfels crossing her course from starboard to port, and the Truitt either lying still or apparently doing the same thing, the Texas was also justified in doing what was done, i. e., blowing/one whistle and porting her helm. Shortly thereafter a two-blast signal from the Hoffman was heard, and it was seen with surprise and alarm that the tug was shoving the Truitt stern first across the Texas' course. It is found (as claimed by witnesses from the steamer) that the Texas was immediately put full speed astern, but collision was inevitable. Estimates of time and distance in this case are perhaps a little more than usually variant, but that time was brief and distance small is abundantly established, and it is also to be remembered that, while the vessels were approaching each other at an aggregate speed of probably seven knots, the Truitt was exposed broadside (or nearly so) to the ebb tide, and was at and before the moment of danger being set down strongly against the Texas' bow. It is in my judgment true that had those on the Texas appreciated, when they first saw tug and schooner, that the latter was approaching her crabwise, it would have been the duty of the Texas to stop and reverse before she did, and it is probable, but not certain, that such earlier reversal would have prevented collision. Yet, even as to this, an element of considerable doubt is introduced by the strength of the tide set.

It is therefore concluded that the Texas was the privileged vessel as against the Hoffman, even if it had been immediately seen what the Hoffman was doing and how she was towing; further, that the Texas was excusable in not immediately seeing the intended course of tug and tow; and that as soon as the Hoffman's performance was

perceived the Texas instantly stopped and reversed, which was all she could do. Therefore the Texas is free from fault.

[2] The substantial fault alleged against the Truitt is permitting herself to be towed stern first. That it was an additional fault for the Hoffman to tow the schooner in this manner is in my opinion abundantly established by the evidence. Much testimony has been taken as to the practice of towing stern foremost; undoubtedly it is customary for short trips and when shifting around wharves and piers. Under such circumstances, it is sometimes necessary; but the weight of expert testimony against the practice is summarized in the evidence of Capt. R. J. Barrett, whose competency and knowledge of towing customs in this harbor are unimpeached, and whose opinion is mine.

The necessary effect of towing stern foremost in open waters on a hazy day is perfectly shown by the unanimous testimony of observers on the Texas who had no desire to run into collision and every incentive to look out with care; yet they were all deceived for a time short—yet dangerously long—by the apparition of a schooner heading away from the line of their course. It is a good test of what a man should do, to observe the result of what he does do upon other careful men; and when that test is applied to the evidence in this case, the net result is correctly (if somewhat profanely) summed up in the remark of Capt. Cole of the Castleton to his quartermaster.

It does not, however, follow, from the fact that the Truitt was negligently towed, that it was legally negligence in the schooner to permit such towage.

The circumstances under which the towage began were of the most ordinary kind, viz., the tug, having been hired to take the schooner to her anchorage, came alongside, made fast her lines in her own way, and began her work without any conference with the schooner's master and without any instructions, objections, or guidance from him. Where the master of a considerable ship laden with valuable cargo permits or suffers not merely minor errors on the part of his comparatively valueless tug, but by silence acquiesces in a method of towing dangerous not only to himself but to other vessels, it seems to me that the doctrine of the tug being "the dominant mind and will in the adventure" of towage (The Margaret, 94 U. S. 494, 24 L. Ed. 146) needs modification, at least to the extent of rendering the towed vessel responsible for the results of negligence inherent in the adventure and apparent before towage begins. A vessel laden with a substance liable to explosion by concussion might well be held liable for voyaging at all in a crowded harbor without advertising her condition by flag or signal, she could not put the whole duty of warning on a tug, and it has been held that a vessel offering herself for towage without divulging the fact that her steering gear was out of order became herself responsible. The A. W. Booth, 135 Fed. 519, 68 C. C. A. 69.

Failure to tell of a defective steering gear is not so flagrant an error of judgment as failure to correct a method of towage obviously

dangerous, wholly unnecessary, and calculated to mislead all other vessels having reason to navigate with reference to tug and tow.

These views, however, cannot prevail against The Manhattan, 186 Fed. 329, 108 C. C. A. 407. In that case the masters of vessels in a tandem tow were advised by the tugmaster to "pay out plenty of hawser," whereupon they paid out their own hawsers to lengths illegal under a statute, well known to be intended to stop just what they did. Yet it was held (notwithstanding the act), and after the long hawsers had directly contributed to a collision, that the negligence available to third parties injured was merely that of the tug for towing with illegal hawsers, and not that of the boats towed for providing the same.

As was well said by counsel for the Truitt, this decision is of the kind that "closes discussion," and under its direction it must be held that it cannot be declared negligence on the part of the schooner to suffer herself to be towed stern foremost under the circumstances shown by the testimony herein.

The libel of the Truitt is dismissed as to the Texas, and the libel of the Texas is dismissed as to the Truitt. Decree in each case against the Hoffman.