D. W. RYAN TOWBOAT CO., Inc., v. DRAPER et al.*

BOWERS SOUTHERN DREDGING CO. v. SAME.

(Circuit Court of Appeals, Fifth Circuit. January 27, 1920. Rehearing Denied February 24, 1920.)

No. 3383.

1. DEATH ☜14(1)—RECOVERY FOR NEGLIGENT DEATH OF SEAMEN AUTHORIZED.
   Where the owner of a small harbor tug, unseaworthy for ocean navigation, and whose master had only a coastwise license, procured a license for her to proceed to a Mexican port in tow, without use of her own power, or necessity of a crew, but kept master and crew on board, with orders to keep up steam, both such owner and the towing company *held* liable for death of master and crew, who were drowned when the tug capsized in a storm, where they were given no orders to cut loose, and were not taken off, although there was ample time before the gale struck.

2. TOWAGE ☜4—TUG RESPONSIBLE FOR MOVEMENT OF TOW.
   When tug and tow proceed on a voyage, the master of the tug controls and dominates, and there can be no divided responsibility.

Appeal from the District Court of the United States for the Southern District of Texas; Joseph C. Hutcheson, Judge.

Suit in admiralty by Carrie S. Draper and others against the D. W. Ryan Towboat Company, Incorporated, and the Bowers Southern Dredging Company. Decree for libelants, and respondents separately appeal. Affirmed.

John Charles Harris, of Galveston, Tex., for appellant D. W. Ryan Towboat Co., Inc.

Ballinger Mills and John Neethe, both of Galveston, Tex. (Terry, Cavin & Mills and Williams & Neethe, all of Galveston, Tex., of counsel), for appellant Bowers Southern Dredging Co.

Stuart R. Smith, of Beaumont, Tex., and Lewis Fisher and H. C. Hughes, both of Galveston, Tex., for appellees.

Before WALKER, Circuit Judge, and GRUBB and JACK, District Judges.

JACK, District Judge. The libelants, here appellees, relatives of members of the crew of the tug Bertha, which was lost with all aboard, off Aransas Pass, Tex., while being towed from Galveston to Tampico, Mexico, brought this suit against the D. W. Ryan Towboat Company and the Bowers Southern Dredging Company for damages resulting to them from the death of their decedents, alleged to have been due to the negligence of the appellants. From a decree in favor of the libelants, awarding them damages in the total sum of $34,250, to be paid in equal parts by claimants, this appeal is prosecuted.

[1] The Bowers Southern Dredging Company, owner of a dredge-boat and of the tug Bertha, having use in the harbor at Tampico for the dredge and the tug, and the latter not being a seagoing vessel, entered into a contract with the D. W. Ryan Towboat Company, owner of the tugboat Chief, to tow the dredge and Bertha from Galveston to Tampico. The dredge was attached to the Chief by a hawser of about 700 feet length, and to the dredge the Bertha was attached by a hawser about 600 feet long.

Both the dredge, which was not a self-propelling vessel, and the steam tug Bertha, carried full crews. The latter was licensed to proceed from Galveston in tow of the steamer Chief, and on said voyage was exempted from carrying licensed officers and crew specified in certificate of inspection, but the license provided that it should not use its own propelling power. Capt. Dittmore, of the Bertha, had only a coastwise license from Galveston to Aransas; it not being contemplated, as stated in the certificate issued the vessel, that he should navigate her. The Chief was under command of her master, Capt. Sanford. Besides her crew, she carried Capt. Nelson, superintendent of the Bowers Southern Dredging Company.

On March 15, 1917, the Chief steamed out of Galveston harbor with the dredge and the tug Bertha in tow, in the order named. On the following evening, when about 25 miles off Aransas Pass, the weather became very threatening, and Capt. Sanford, of the Chief, after con-

sultation with Capt. Nelson, decided to put into the Pass, and headed the flotilla that way. This was about 5:10 in the evening. The wind shifted to the northeast and increased in force as darkness came on. At 8:30 no lights could be seen on the Bertha, and a few minutes thereafter the dredge got broadside in the trough of the sea. Something seemed to be holding her back. Capt. Nelson asked Capt. Sanford, of the Chief, to speed up his engines, and, when this was done, the dredge came up in the wind head to, and, a few minutes later, signaled that the Bertha was gone. The wind by that time was blowing a gale, and nothing could be done for her relief. The Chief and the dredge all night lay off Aransas Pass, and the next morning went inside. Search was made, both by the tug Chief and the life-saving station, but no trace was ever found of the Bertha, save a door, wrenched from its hinges. Capt. Swanson, of the dredge, stated that he had felt something give way, and that the dredge then began to swing up into the wind. On examination he found the tow line to be slack, and signaled the alarm to the Chief. It was the opinion of the crew of the dredge that the Bertha turned turtle and was sunk by the fury of the gale, and that her towline broke when the Chief speeded up her engines.

The contentions on which libelants rest their case are that the Bertha was topheavy and unseaworthy, and was not properly manned and officered; that, although the officers had only coastwise licenses, they were instructed by Capt. Nelson, of the Bowers Southern Dredging Company, to cut loose from the dredge and navigate under the tug's own steam whenever they saw proper; that under such conditions it was negligence to carry a full crew on the Bertha, when the only persons needed were caretakers; that, when the barometer indicated the approach of the storm, the tug Chief should have immediately headed for Aransas Pass, or made provision for the safety of the crew of the Bertha by removing them to the dredge or to the Chief.

It is claimed in defense that the tug Bertha was seaworthy; that she was specially prepared for the voyage by boarding up her doors and windows and constructing a storm break on her main deck; that all indications were for fair weather when the flotilla left Galveston, and that when the barometer began to fall the wind was from the northwest, and consequently not threatening, and that it did not whip around to the northeast until later in the evening; that when the danger became evident the Chief headed towards Aransas Pass, and when the storm broke in full force, after dark, nothing could be done for the relief of the crew of the Bertha. It is further urged that, had the Bertha cut loose from her hawser, she would have had ample time under her own steam to have found shelter, as she could have made much faster time than the Chief with her in tow, or had she cut loose, and not headed for the Pass, she might, under her own steam, have faced the wind and weathered the storm.

In addition to these defenses urged by both claimants, it is further contended, on the part of the Bowers Southern Dredging Company, that the crew of the Bertha assumed the risk, and, further, that, if

they lost their lives through negligence of any one, it was the negligence of fellow servants, for which the employer is not liable.

The tug Bertha was constructed for coastwise or harbor service. There was some evidence to the effect that she was unsteady and topheavy, due to her narrow construction. She may have been safe for work in the harbor, or on inland waters; but it is evident from her license, which prohibited her navigating under her own steam, and from the fate that finally overtook her, that she was not of sufficient size and power to undertake such a voyage, except as a tow. This knowledge was brought home to the Bowers Southern Dredging Company when it accepted the license with such limitations. But the restrictions of such license were not accepted in good faith, for Nelson testifies that, on leaving Galveston, he instructed the crew to keep steam up all the time, and to cut loose and go as they pleased whenever they felt like it, and this, notwithstanding the fact that the captain had only a coastwise license. As the Bertha was licensed to go only as a tow, it should have been treated as such, and its crew removed to the Chief or to the dredge when the barometer gave evidence of the approach of a storm. The barometer began to fall at noon, and by 5 o'clock there was every appearance of bad weather. An hour or more calm preceded the breaking of the storm, so that there was ample warning and opportunity to have gotten the men off the Bertha. Instead, no communication whatever was had with her. Nelson and Sanford stood on the instructions previously given the crew by Nelson to cut loose and navigate the ship whenever they saw fit.

The Bertha was, at the time, 25 miles from the coast, whereas the limit for such a vessel, so manned, was 20, beyond which the officers of the vessel were without authority to navigate, even had they been on a seagoing vessel. Under these conditions, it is contended that the crew of the Bertha were themselves to blame; that in the exercise of good seamanship the Bertha should have cut loose and headed for Padre Island or Aransas Pass. Nelson testifies that, had she done so, she could have easily reached a place of safety long before the tow, or she could have steamed along to leeward of the dredge, and there found shelter from the wind, or that she could have headed into the wind and ridden out the storm. It is sufficient in answer that good seamanship could not be expected of men who were not good seamen, and the officers of the Bertha were not competent seamen that distance from shore. If such were the part of good seamanship, in the sudden danger that confronted them, to cut loose from the dredge and navigate under the Bertha's own steam, in violation of the terms of its license, Nelson, the representative of the Bowers Company, or Sanford, the captain of the tug having the Bertha in tow, should have ordered the captain of the Bertha to do so. The latter had the right to rely on the superior knowledge and experience of Sanford, and of Capt. Nelson on board the Chief with him, to look to him to take all proper and necessary steps for their protection, or to order them to cut loose from the dredge in event the exigencies of the situation made such action imperative.

But for the negligence of the claimants, the master and crew of the Bertha would not have been placed in the perilous position in which they found themselves when the storm broke upon them, and the claimants, therefore, cannot escape liability because of an error of judgment—if in fact there was such—on the part of the master of, the Bertha, thus called on in such emergency to take action to save the lives of his men. It is by no means certain that, by such action, the lives of the crew of the Bertha would have been saved; and, had they been lost, the claimants herein might well have said, and with much force, that only the master of the Bertha was to blame, as he had acted without orders from his superior officer, Nelson, or the captain of the Chief, and in violation of the terms of the license issued to the Bertha.

[2] When tug and tow proceed on a voyage, the master of the tug controls and dominates; there can be no divided responsibility; the tug leads; the tow must follow. The Quickstep, 9 Wall. 665, 19 L. Ed. 767; The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Fort George, 183 Fed. 731, 106 C. C. A. 169; The Doris Eckhoff, 50 Fed. 135, 1 C. C. A. 494; Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The Manhattan, 186 Fed. 329, 331, 108 C. C. A. 407; The Teaser, 246 Fed. 223, 224, 158 C. C. A. 379. Either the Bertha was in reality a tow, as her license intended she should be, and should have looked to and taken her orders from the tug, or she was not a tow, but a self-propelling vessel, free to navigate under her own steam. If she be considered a tow proper, the claimants are at fault because Nelson and Sanford failed to transfer the men to the dredge or to the Chief in the face of the impending storm, or to otherwise provide for their safety. If she be not considered a tow, the claimants were at fault in having failed to order the captain of the Bertha to cut loose, and, under her own steam, take measures for her own preservation, which Nelson and Sanford both say might successfully have been done. In either alternative, the safest and the proper course would have been to have transferred the men from the small, frail Bertha, to the much larger and seagoing tug Chief. The result of cutting loose and navigating under its own steam would have been problematical. The safety of the other course, the obvious one at the time, has been demonstrated.

It is contended that the seaworthiness of the tug Bertha cannot be denied, by reason of the fact of an order of the court fixing a limitation of liability as against the dredge of $40,000, and authorizing a stipulation in that sum in lieu of its surrender, as provided for in Act March 3, 1851, being sections 4283 and 4285 of the Revised Statutes (Comp. St. §§ 8021, 8023). The order was entered by consent, and if its effect was that contended for, such was evidently not the intention of the proctors for the libelants, as testified by them. At best, however, it was only an interlocutory order, which the court had full authority to set aside, especially inasmuch as the parties were thus placed back exactly in their original positions, and neither prejudiced thereby. The decrees were against the defendants in personam, and

not in rem, and the total amount was less than the agreed valuation of the dredge.

The libelants were authorized to bring the action under articles 4694 and 4698 of the Revised Statutes of Texas, providing for such actions where decedent's death was caused by the negligence of another. The plea of contributory negligence is without merit. Even if applicable, it would be only to those suing for damages for the death of the captain of the Bertha, and he, we think, was not negligent in failing to cut the Bertha loose from the dredge. Neither may it be said that the loss of the Bertha was an act of God, or an ordinary peril of the sea, the risk of which was assumed by the crew. The death of those aboard was due to the combined negligence of the defendant corporations. The crew of the Bertha were servants of the Bowers Southern Dredging Company and negligence of the master is not an assumed risk of a servant, nor was the negligence of the Ryan Towboat Company, employed by the Bowers to tow the Bertha, a risk assumed by its crew.

The decree of the lower court is affirmed.