## THE GEORGIA. THE THEODORE H. WICKWIRE. AMERICAN S. S. CO. v. HAND & JOHNSON TUG LINE.

District Court, W. D. New York. August 8, 1927.

Brown, Ely & Richards, of Buffalo, N. Y. (John B. Richards and Laurence E. Coffey, both of Buffalo, N. Y., of counsel), for American S. S. Co.

Burke & Desmond, of Buffalo, N. Y., and Goulder, White & Garry, of Cleveland, Ohio, for the Georgia and Hand & Johnson Tug Line.

HAZEL, District Judge. The libelant, American Steamship Company, is proceeding against the harbor tug Georgia on a claim for damages assigned to it by the Great Lakes Transit Corporation, owner of the injured fuel scow Toledo. The damages were caused by the alleged negligent towage by the tug of the large steamer Theodore H. Wickwire (impleaded under Admiralty Rule 56) on June 2, 1923, in Blackwell's canal, under the following circumstances:

The steamer Atterbury, 350 feet long, 40 beam, 30 in depth, headed upstream, was unloading her cargo at the Lehigh Valley dock, while the square-cornered fuel scow Toledo, 159 feet long, 36½ beam, and 17 in depth, also headed upstream, lay parallel and close alongside fueling her. The surface channel at this point is about 185 feet wide, the dredged channel appreciably narrower (the precise width and depth of the invisible channel does not appear), and while the two vessels were lying in the position stated, the

Wickwire, which is 444 feet keel, 56 beam, 29 deep, drawing 19-8 aft and 19-3 forward, heavily laden with 9,000 tons of coal, and aided in her navigation by the Georgia, came along, under her own power at slow speed, not more than bare steerageway, and tried to pass on the side of the fuel scow, but her starboard bilge struck the dredged channel bank and her port side at No. 3 Hatch, where she is wider than forward, impinged the port corner (forward) of the scow, wedging her fast against the latter on one side, completely blocking the deeper channel. It was difficult to release her. Assisted by the tug, she tried to go ahead, and failing, tried going astern under her own power, aided by the tug, which could navigate in the shallow water; but she held fast until the night crew of the tug came on duty. Then, after a conference between the master of the freighter and master of the Georgia, it was thought advisable for the tug to take the stern line of the freighter and haul away on her starboard quarter; the freighter using her propellers astern. This applied method was successful and the Wickwire cleared; but, in her slow backing and sliding, her side plates or butt straps, which projected a little, impinged a broken strap or fender iron on the port bow of the scow, with the result that she sustained additional damages to those sustained under the original jamming.

It is claimed by libelant that the tug Georgia was solely to blame for leading the Wickwire into a position where the width and depth of the channel were insufficient to permit her to pass between the Toledo and the invisible channel; and further that the Wickwire was without fault in her efforts to clear by moving astern with the aid of the tug.

On the part of the Georgia, it is urged, in the main, that the Wickwire was in full charge of her own navigation, the tug merely helping her around corners in the canal, and hence she alone should be held responsible; also dismissal of the libel is asked because of delay in proceeding against the tug.

▮ The contention of respondent is that the service of the tug Georgia was not the usual towage wherein the tug became the dominant factor in the navigation, but since the freighter proceeded under her own power and had charge of the maneuver, the tug was impeccable. The evidence does not go so far, and engagement of a tug to take steamers through the canal to the lake is ordinarily considered in this court as a pilotage, and requires the tug to pursue a proper course, leading the way safely through the canal, though assisted by the steamship.

▮ The rule applies, in my opinion, that the tug was bound to know the channel, its width, depth, and obstructions, having in mind the draft of the boat she was towing, the presence and fueling of the Atterbury at the dock, together with the manner in which she and the fuel scow were lying, and the space they occupied. She was bound to know whether the dredged channel was wide enough to enable the freighter to pass safely. Going ahead was reasonable assurance to Capt. Elliott of the Wickwire that the water was ample to effect passing. The fact that Capt. Elliott had passed this point at other times when no vessels were lying abreast, or when only one vessel was at the dock, does not qualify his belief or anticipation of proper guidance. If there was uncertainty in the mind of the master of the tug as to safe passing, he should have waited or given notice or warning of his uncertainty, so that either the scow might have been moved, or other steps taken to ease the situation. Failure to do so was a fault on her part and she became liable for the impingement of the scow and, as shown later, her resulting damage. The Margaret, 94 U. S. 494, 24 L. Ed. 146; Vessel Owners' Towing Co. v. Wilson (C. C. A.) 63 F. 625; Wyomissing (C. C. A.) 228 F. 186.

The Texas (D. C.) 192 F. 233, and The Doris Eckhoff (D. C.) 32 F. 555, cited by respondent and claimant, are not thought, in principle, contrary to the settled rule that a tow must follow the guidance of the tug and keep in her wake. In the Texas the tug, at ebb tide, towed the schooner stern first with the tug on her side. In the opinion of Judge Hough, the master of the vessel should have known that this was a dangerous thing to do; but he nevertheless held the tug primarily to blame for trying to pass the Texas starboard to starboard, she being in a position which led her to suppose that the schooner, which was open to her vision, while the tug was not, was at anchor. In the Doris Eckhoff, the vessel and tug were held jointly liable on the ground that they were both participants in the control of the navigation. In that case the tug violated a state statute requiring vessels in the East River to go in midstream, and Judge Brown ruled that, as this occurred without protest from the vessel and without effort to correct her fault, or direct the tug to do so, the vessel also was to blame. But the Circuit Court of Appeals disagreed, 50 F. 136, with this view on the ground that the proofs showed that no orders or directions from the vessel to the tug, relating to her movements, were given.

In the instant case the situation did not

demand a protest against going ahead and passing the Toledo, since there was ample surface space for passing safely, and it was incumbent on the towing tug to have in mind the depth of the water and changes of the bottom caused by dredging the channel. I find nothing in The Atlantic City (C. C. A.) 241 F. 62, and other cases cited by respondent, to qualify the principle of the adjudications to which libelant attaches importance, since there is a preponderance of evidence to establish the fault of the tug in putting the Wickwire in a dangerous position.

On behalf of the tug it is also contended that in any event the damages sustained by the fuel scow are attributable to the Wickwire alone, due to the direction of her master as to the manner of attempting her release. I have considered the evidence on this point, and arguments bearing thereon. The proofs fairly show that it was inadvisable and impracticable to endeavor to move the steamer Atterbury forward or astern, she having been crowded up against the dock. The Toledo likewise was in a position incapable of moving her sternward because of the manner in which she was held or jammed. In all probability, it would have resulted in greater damage and loss if it had been attempted to move either of these crafts one way or the other. The testimony of respondent's expert witnesses, as to the practicability of moving one or the other, must be disregarded, since I am convinced it was impossible to move them without damage. The suggestions of other methods of releasing the freighter would also have involved greater expense than was warranted. It is to be noted that the master of the Atterbury expressed the view that moving his vessel, considering the position she was in, close to the dock and held fast on the other side by the scow, would not only have damaged the scow, but might have endangered the safety of the dock. His opinion is entitled to more weight than that of the experts answering hypothetical questions, and who were not present at the place of disaster. Indeed, Capt. Lehan's testimony finds support in the testimony of Harry Smith, a wreck master, who thought the method of release adopted by the Wickwire and tug was proper. Before the astern movement began, it was arranged that Capt. Elliott would signal the tug when it was desirable to stop pulling, so as to prevent greater injury to the scow, and signals were given several times to which the tug assented by stopping,

and on a third pull the Wickwire cleared. On the whole, considering the conditions, reasonable judgment, in my opinion, was used in breaking the wedge, and the Wickwire was without fault in extrication from the position in which the lack of vigilance, care, and foresight of the master of the Georgia had placed her.

It is next contended that libelant was guilty of laches in not bringing the libel earlier, but it is shown that shortly after the mishap there was an investigation by libelant, followed by a report of the master and crews of the Georgia, which was aware of the probable damage sustained. The delay of two years in filing the libel was not prejudicial to respondent, and under the facts, the doctrine of laches is believed inapplicable.

In Bailey v. Sundberg (C. C. A.) 49 F. 583, it was ruled in this circuit that, where there is nothing exceptional in the case, courts of admiralty govern themselves by the analogies of common-law limitations. See, also, The Oregon (C. C. A.) 6 F.(2d) 968. Nor is there merit in the assertion that, as the Wickwire paid the Toledo's damages, she must be estopped from suing under the assigned claim.

I find the steam tug Georgia was primarily and solely at fault for the wedging in question and resulting damage, and a decree for libelant may be entered with costs.